LOUIS KOUSAL ET AL V. TEXAS POWER & LIGHT COMPANY.

No. 8179. Decided March 22, 1944.
Rehearing overruled April 26, 1944.
(179 S. W., 2d Series, 283.)

*George Clark, H. O. Clark, John B. Fisher, Jr.*, all of Waco, for petitioners.

On the question of overcharge and discrimination: Texas P. & L. Co. v. Hilltop Baking Co. 78 S. W. (2d) 718; Texas P. & L. Co. v. Doering Hotel Co., 139 Texas 351, 162 S. W. (2d) 938; El Paso Elec. Co. v. Raynolds Holding Co., 128 Texas 495, 100 S. W. (2d) 97.

*John Maxwell, Bryan & Maxwell,* of ·Waco, *Logan Ford, Burford, Ryburn, Hincks & Charlton,* all of Dallas, and *Chas. L.' Black,* of Austin, for respondent.

The petitioners having failed to allege or prove, or even claim any actual loss or that the preferred customers were their competitors and that they were not entitled to the rate which their competitors received, which was proven to be an unlawful rate, they established no cause of action. Pennsylvania Ry. Co. v. International Coal Mining Co., 230 U. S. 184; Postal Tel. & Cable Co. v. Associated Press, 228 N. Y. 370; Houston & T. C. Ry. Co. v. Rust & Dinkins, 58 Texas 98.

MR. JUDGE BREWSTER, of the Commission of Appeals, delivered the opinion for the Court.

This suit is a controversy between the petitioners, Louis Kousal and Ed Kousal, and the respondent, Texas Power & Light Company, concerning charges made and collected by the latter for electric current furnished petitioners for lighting purposes from January 1, 1918, to October 31, 1938. On a jury verdict, favorable to the Kousals, the trial court rendered judgment in their favor for $7,288.44. That judgment was reversed by the Court of Civil Appeals and the cause rendered for the respondent, Associate Justice Hale dissenting. 170 S. W. (2d) 278, 288.

Much of the dispute in this Court relates to the nature of the cause of action pleaded and proved by petitioners in the trial court and asserted by them in the Court of Civil Appeals. Respondent contend that petitioners are urging here a theory different from that advanced in the courts below. It is necessary to determine that question first, because litigants are restricted here to the theory of recovery asserted below. Safety Casualty Co. v. Wright, 138 Texas, 492, 160 S. W. (2d) 238, 245.

The Kousals alleged that the defendant utility was supplying electric power and current to its customers in Waco first under a contract with the city and thereafter under an ordinance passed by the city's board of commissioners, which adopted schedules of rates applicable to various classes of consumers of power and current in the city; that, under both the contract and the ordinance, the utility agreed and was required to furnish *power* under the general *power rate,* which it designated as the F-1; that it "has had only one printed form of F-1 rate, *which by its terms has provided that it was a power rate";* that the F-1 schedule was available to all *power* consumers having as

much as one horse power connected and operated as much as one hour per week. They alleged, further, that the utility owed them the duty "to furnish power and current and billing schedules without arbitrarily, unjustly and unlawfully *discriminating*" between them and other *power and current* consumers being rendered similar service under similar circumstances—that is, it owed them "the duty of operating its business without unlawfully and unjustly *discriminating*," either as to service or rates. They alleged that, as operators of a wholesale and retail fish and meat market, they used a considerable amount of machinery and equipment driven by electric motors and that, therefore, they were industrial power consumers within the contemplation of the aforesaid contract and ordinance and within the contemplation of the rates, rate schedules, billing practices and designations of the utility; that, nevertheless, the utility "unlawfully and unjusly *discriminated*" against them in not placing their market on the F-1 schedule as to the electric current consumed by them for both *power and lighting;* that this alleged discrimination arose from the fact that it was billing eleven named concerns in Waco on the F-1 as to both their power and light consumption, which concerns were being served under similar and like circumstances as were the Kousals. Their prayer was for recovery of the difference between what they paid during the time in question with their power consumption billed on the F-1 and their lighting consumption on another rate and what they would have paid had they been billed on the F-1 rate as to both power and lights. (Italics ours.)

Their theory of recovery is further disclosed by the very first special issue submitted to the jury, namely, "Do you find from a preponderance of the evidence if any, that in January of 1918, the Texas Power and Light Company was billing some *one* or more of the electricity consumers in the City of Waco on the F-1 rate as to their entire electric bill, both power and lights?" This was followed by issues designed to determine whether these other "such consumers, if any" had billing factors similar to those of the Kousals' market. (Italics ours.)

It is apparent, therefore, that the Kousals took the position in the trial court that the F-1 *power* rate was applicable to both their *power and light* consumption, not because it had been approved and adopted by the City of Waco as a power and lighting rate, but because the utility, through the action of some of its agents, had so applied it to eleven other designated consumers or to "some one or more" of them. Any doubt that such was their contention is wholly dispelled by statements made by their leading counsel in his argument before the jury. For

example, he said, "They (the utility) know that if they had wanted to change this F-1 rate *so as to make it applicable* to the *power and lights* for the picture shows, or anybody else, so that they could *prefer* them over Mr. Louis Kousal, *all they had to do was to go down to the board of Commissioners of the City of Waco and get permission to do it.*" Again, he said, "They (the utility) have *had an F-1 rate that they know they couldn't change without authority of the commissioners of the City of Waco* and they haven't made any effort to change it." And, further, he said, "The court is not asking you what Mr. Blair (head of the utility's rate department) might have done, because if he wanted to he could have changed this F-1 rate any way on earth he wanted to do it, if the city would permit him to do it." (Italics ours.)

That they did not change that position in the Court of Civil Appeals appears from the following quotation of the second and third paragraphs of the "Statement of the Nature of the Case," made in the brief filed by them as appellees in that court:

"The rate involved in this cause was designated by the Texas Power & Light Company as the F-1, commonly known as the franchise *power* rate, since *the same was available by the contract between the appellant and the City of Waco, and the ordinances which succeeded said contract*, to all *power consumers* in the City of Waco having as much as 1 horsepower of connected load which was operated as much as one hour per week.

"*The theory upon which the plaintiffs sought* and were allowed *recovery* in this case *was* that the Texas Power & Light Company *discriminated* against them, in that the F-1 rate was applied to *other* customers situated the same and similarly as plaintiffs, in so far as the application clause was concerned, on their *entire electric bill, both power and incidental lighting,* while the defendant failed and refused to make the same character of application to these plaintiffs under the same rate. (It appeared that the company did in fact make such application to plaintiffs' business for a period of about four months, but failed to the balance of the period in question.) *It was contended by the plaintiffs that no new classification or charge under the F-1 rate was made, as required by the contract between the Texas Power & Light Company and the City of Waco and the ordinance succeeding said contract justifying the preferment of such customers, but that the same was pure discrimination.*" (Italics ours.)

Then, in their first counter proposition, they point out that

the contract and ordinance provided "the method by which the Texas Power & Light Company could change any of its published rates, and required the amendments to be filed with the City"; and then they assert that "the undisputed evidence shows that appellant did not design and file with the City a separate F-1 rate applicable only to the consumers shown to be preferred in the billing under the F-1 rate."

■ Thus is asserted a theory of recovery which we think finds no support in the basic principles governing utility rates and rate making. It is axiomatic that there is a public interest in the rates charged by public utilities for their services. That interest is not alone that the rate be reasonable from the viewpoint of the individual consumer but that it be such as fairly to insure that the utility can continue to perform its public function. Utility rates, therefore, must be fixed with a view to the consumer's interest on the one hand and to the public's interest in the continued existence of the utility on the other. Because of this, fixing and regulating utility rates is said to be a governmental function inherent in the state. It is legislative in character, but the legislature may delegate the power to rate making governmental agencies or to municipal corporations as to utilities operating within the limits of such municipal corporations. Texas-Louisiana Power Co. v. City of Farmersville (Com. App.), 67 S. W. (2d) 235. But, when so delegated, it must be exercised by the agency or municipality to whom it is intructed for the benefit of its people, and they cannot delegate it to anybody else. Green v. San Antonio Water Supply Co. (Civ. App.), 193 S. W., 453. This power of regulation the legislature has conferred on "Home Rule" cities by Art. 1175 (12), Vernon's Texas Civil Statutes, which also prescribes that such cities may "from time to time alter or change such rules, regulations and compensation." See, also, Art. 1119, ibid.

Art. 262, of the charter of the City of Waco, provides that its board of Commissioners "shall have power to determine, fix and regulate the charges, fares or rates of any * * corporation enjoying * * the franchise, or exercising any other public privilege * * and may * *, from time to time, alter or change such rules, regulations and compensation." On October 6, 1911, it made a contract, effective January 1, 1912, and for a period of ten years thereafter, with Waco Electric & Gas Company, respondent's predecessor, by which that company agreed to furnish to the citizens of Waco "the most approved service for electric *lighting,* heat and *power* * * at the following rates." Then under the designation *F-1* appeared the following: "The rate to the public *for power* shall be as follows." Then followed a price

graduated on KWH monthly consumption. The Texas Power & Light Company assumed the obligations of that contract in 1912, and in 1922 entered into a new contract with the city whereby it agreed that, for a period of ten years, beginning January 1, 1922, the *rate* to the public *for power* should be on Schedule F-1 at a price graduated on KWH monthly consumption. Then the contract provided that the agreed rates might be changed or revised either by application by the utility to the city commission or by the city, upon its own motion, after notice to the utility and a hearing. In this connection it was provided, "For the purpose of fixing a rate or rates as herein provided, the Company may from time to time prepare and file with the Board of Commissioners schedules of rates based upon a reasonable return, as above provided, and shall at the same time furnish said Board of Commissioners such information as it may require relating to its property hereunder and the fair valuation thereof, together with the operating expenses and the approximate cost of electricity delivered to customers. Within sixty (60 days from the date of filing such schedule said Board shall, by approximate action, *either approve or disapprove same* in whole or in part and shall so notify the Company in writing. *Failure by the Board to so notify the Company* of its approval or disapproval of such schedule within sixty (60) days from the filing thereof *shall be construed as an affimative approval thereof by said Board.*" In 1930 the City passed an ordinance fixing the rates for domestic and commercial consumers of electricity according to schedules attached to the ordinance, effective January 15, 1931. The parties agreed that the five rate schedules referred to in the ordinance as attached, although not in fact attached, were filed and became, therefore, a part of the ordinance. They included Rate MS-1, as the Commercial Lighting Rate, and Rate F-1 as the *Franchise Power Rate*. No rate was ever filed with the city authorities making this F-1 rate available to electricity consumed by the people of Waco for lighting at any time during the period in question, nor did the utility make any application to the city commission for permission so to change or revise that rate, as its contract with the City required as a predicate for such action. Therefore, as Kousals' counsel correctly stated to the jury, the utility "had an F-1 rate that they know they couldn't change without authority of the commissioners of the City of Waco and they haven't made any effort to change it"; it had a rate which it could not change "so as to make it applicable to the *power and lights* for the picture shows, or anybody else," without the City's permission. (Italics ours.)

■  Hence it is clear, we think, that the F-1 rate, established both

by contract and by ordinance, was meant to be applied only to *power* consumption. Its very terms exclude any idea that it was to be applied to electricity used for incidental lighting. The distinction is well recognized by the authorities, because "valid reasons may exist for different rates for current furnished for lighting purposes from that for power purposes." St. Paul Book & Stationery Co. v. St. Paul Gaslight Co., 130 Minn., 71, 153 N. W., 262, L. R. A. 1918A, 384. And see People v. Public Service Commission, 148 N. Y. S., 583. Therefore, since the City Commission of Waco, exercising the delegated legislative power of fixing the several rates to be charged by the utility for its several services to the people of that city, fixed the F-1 rate as exclusively a power rate, we must presume that it found that there were valid reasons why that rate should not be extended to include lighting. Other rates were fixed for lighting consumption, and the Kousals make no complaint as to them; their only grievance is that, except for a few months of the time in question, the F-1 rate was not applied to their consumption for lighting as well as to that for power. Therefore, the F-1 was the lawful rate for power, whereas other and different rates were lawful for lighting.

██ So we come to the controlling question to be decided here. Can a utility rate, made available by contract between the utility and a city and later by an ordinance of that city to a given class of customers, be made available to a customer not of that class simply by the fact that the utility extends the rate, over a period of years, to "one or more" or "other" consumers who are not of that class but who, as to material billing factors, are similarly situated as the complaining customer? To answer that question in the affirmative would mean that the value of utility service is to be measured not by a rate fixed in the public interest by governmental action but by whatever figure might result from secret misuse and abuse of that rate by agents of the utility in the interest of a few favored customers. It would take from the legislature or its delegate the function of rate making and invest the same in the utility itself. Here, the utility had a solemn contract with the city providing, first, that the F-1 rate should be applied to power consumption, second, that that rate could be changed or revised only by the city commission, either on its own motion, after notice and hearing, or on proper application of the utility. And it is admitted that no such revision of the F-1 rate was ever made, attempted, or requested. Yet we are asked to say that the rate can be extended to lighting consumption by the utility's unlawful and wrongful action in applying that rate to the lighting consumption of a few other customers —eleven, according to the Kousals' petition; "others," according

to their brief; "one or more," according to the court's charge—whose billing factors were similar to those of the Kousals' market. We are asked to say that a new classification or charge can be made under the agreed F-1 rate by the unlawful preferment of a few customers, when no such new classification or charge was ever made as required by the contract and ordinance above described. That is precisely what we would say if we should hold that the Kousals' damage can be measured by the difference between the lawful rate collected from them by the utility and the lower rate unlawfully collected by the utility from a few other customers similarly situated. To paraphrase the language of the Supreme Court of the United States in Pennsylvania Railroad Co. v. International Coal Mining Co., 230 U. S., 184, 57 L. Ed., 1446, to approve such a contention and thus arbitrarily measure damages by undercharges would create a legalized but endless chain of departures from the fixed F-1 rate. It would extend the effect of the utility's original wrong and thus destroy the equality and certainty of rates. Therefore, we are constrained to hold that, although the case made by the Kousals does show unlawful discrimination and preference by the utility of other similarly situated customers, it does not show that the Kousals were charged more than the rate approved and agreed to by the duly constituted governmental agency, hence that they failed to establish a cause of action for overcharge. See Woodhouse v. Rio Grande Ry. Co., 67 Texas, 416, 3 S. W., 323; Cock v. Marshall Gas Co. (Civ. App.), 226 S. W., 464; Postal-Telegraph-Cable Co. v. Associated Press, 228 N. Y., 370, 127 N. E., 256; Interstate Commerce Commission v. United States, 289 U. S. 385, 77 L. Ed., 1273; Davis v. Portland Cement Co., 264 U. S., 403, 68 L. Ed., 762; Pennsylvania R. R. Co. v. International Coal Mining Co., supra, and the many authorities cited in those cases. In cases of unlawful discrimination, like this, the utility customer is not without remedy but his remedy is to sue for the special damages, if any, that he suffers by reason of such discrimination. See Cock v. Marshall Gas Co., supra; Davis v. Portland Cement Co., supra; Seaberg v. Raton Public Service Co., 43 N. M., 161, 87 Pac. (2d) 676; Boerth v. Detroit City Gas Co. (Mich.), 116 N. W., 628; 43 Am. Jur., Public Utilities and Service, sec. 177, and authorities there cited.

Since the question decided controls this case, it is unnecessary to decide any other of the numerous propositions advanced in the several briefs and arguments filed, except the suggestion by the Kousals that one of the city commissioners was the owner of a picture show included as one of the eleven alleged preferred customers, the inference being that his knowledge of

that departure from the agreed rate was a tactic agreement by the city commission to its extension to both power and light consumption. The favored commissioner was bound by his official obligation to impart information that such unlawful preferences were being extended by the utility, to the board of commissioners, 43 Am. Jur., Public Officers, sec. 261. Since he failed to do so, it cannot be said that his knowledge was the city's knowledge, and no inferences or implications can arise therefrom as against the city commission.

It follows that the judgment of the Court of Civil Appeals is affirmed.

Opinion adopted by the Supreme Court March 22, 1944.

Rehearing overruled April 26, 1944.