GENERAL TELEPHONE COMPANY OF THE SOUTHWEST

v. CITY OF EDEN ET AL

No. A-5481. Decided October 3, 1956.

(293 S.W. 2d Series 753)

*Don S. Holdridge*, of San Angelo, for petitioner.

The Court of Civil Appeals erred in holding that the petitioner had the burden of showing by apportionment that part of the total operating revenue and expense attributable to the rural property of the exchange of said city, separate from the revenue and expense of the local exchange. Home Tel. & Tel. Co. v. City of Los Angeles, 211 U.S. 265, 29 Sup. Ct. 50, 53 L. Ed. 176; Lone Star Gas Co. v. State of Texas, 304 U.S. 224, 58 Sup. Ct. 883, 82 L. Ed. 1304.

*Swaim & Swaim*, of Eden, *Kerr & Gayer*, and *Lloyd Kerr*, of San Angelo, for respondent.

In reply cited: Missouri ex rel Bell Tel. Co. v. Public Service Com. 262 U.S. 276, 43 Sup. Ct. 544, 67 L.Ed. 981; Lindheimer v. Illinois Bell Tel. Co., 292 U.S. 151, 54 Sup. Ct. 658, 78 L.Ed 1182.

MR. JUSTICE GARWOOD delivered the opinion of the Court.

This is a companion case to General Telephone Company of the Southwest v. City of Wellington, the opinion in which was handed down on this day, and should be read in connection with the instant opinion, this volume p. 238. As in the Wellington case, the temporary injunction sought by the petitioner-plaintiff telephone company against enforcement of rates established for city subscribers of the exchange by a city ordinance (1952)

under Art. 1119, Vernon's Texas Civ. Stats., was denied by the trial court and the Court of Civil Appeals. 281 S.W. 2d 379.

The pleadings of the petitioner company were sworn and substantially the same as in the Wellington case, except that they alleged a net out-of-pocket loss from operations, even without including a charge for such proportion of interest on company borrowings as might be properly allocable to the Eden exchange. These pleadings, as well as the corresponding evidence on the hearing, were also in terms of a single business unit or exchange for the Eden community, including petitioner's property and subscribers outside as well as inside the city limits, but without separate accounting for the two areas.

The pleadings of the respondents City, Mayor and City Council consisted of a sworn plea in abatement and an unsworn general denial. The former raised largely law questions and in nowise contradicted or attacked the petitioner's sworn allegations as the confiscatory character of the ordinance rates. It was heard and "carried along" with the rest of the case, being thereafter formally overruled in a separate paragraph of the trial court judgment and not made the subject of cross assignment of error by the respondents as appellees in the Court of Civil Appeals.

The grounds on which the trial court denied the writ do not appear in his judgment, nor are there any findings of fact or conclusions of law nor a complaint of the failure of the court to make them, although the transcript does reflect a request of the petitioner company for them.

As in the Wellington case, the petitioner backed its pleadings with oral testimony of various witnesses, most of whom, while being its own executives, are probably to be rated as experts, and one of whom was an independent engineering consultant of long experience in the valuation of telephone properties, who testified that he had personally inspected and valued all of the Eden exchange properties both within and without the city limits and had found the valuations contended for by the petitioner to be reasonable and otherwise correct. As below indicated, the respondents presented no evidence in anywise relating to the reasonableness of the ordinance rates, and their cross examination of the various officials and experts, who testified for the petitioner company, was largely limited to matters such as the condition of the rural or noncity properties ( some of the lines were privately owned by individual rural subscrib-

ers and were accordingly not included in the petitioner's valuations) and the quality of service of the Eden exchange, the fact that the general area was suffering the adverse effects of a prolonged drouth and the matter of division of the exchange income as between local or exchange service on the one hand and long distance on the other.

The respondents did prove by a local banker that the local deposits of the company over a given period were considerably higher than the figures testified to for the petitioner as representing its income from subscribers. The company explained this without contradiction as due largely to the fact that the deposits included collections for long distance tolls as well as excise taxes. One individual respondent also testified on behalf of the respondents, and only in the most general terms, that in his opinion derived from his past services as tax assessor, mayor and member of the equalization board of the City, the petitioner had followed the practice of rendering its properties for city ad valorem taxation disproportionately high in relation to their actual value.

In connection with the plea in abatement, several of the individual respondents testified that the City Council considered the petitioner to be entitled to some increase over the 1952 rates sought to be enjoined, although not to the full increase requested by the petitioner of the City prior to September 14th, 1954, which later these witnesses indicated to have been 100 per cent.

Still in connection with the plea in abatement, the respondents also introduced evidence, as did the petitioner company, concerning a city council resolution of September 14th, 1954, as reflected by the original minutes of that date, of which a copy had been furnished to the petitioner company (well prior to the institution of this suit about the middle of February, 1955) briefly reciting unanimous passage of a resolution "denying an increase in rates to the Telephone Company," and a purported correction of the same minutes made at a later meeting on March 1st, 1955, (evidently after the filing of the instant suit and after several council meetings had meanwhile been held without attempting any correction of the earlier minutes). The purportedly corrected minutes stated in effect that the Council believed the matter of the requested increase "could be worked out in due time," but that the request should not be approved "at this meeting," since the Council considered the service antiquated and that "the lines were in poor condition," and the petitioner had expressly refused to commit itself to any im-

provement of these conditions until receiving an increase in rates.

The Court of Civil Appeals affirmed the refusal of the writ on two grounds. The first was that the petitioner company "* * * failed to show that the net operating income from that portion of its plant subject to the rates fixed by the ordinance was less than a fair return on its investment within the city * * * ." This, especially when viewed in context, can only be understood as referring to the same point decided by us in the Wellington case, to wit, the effect of failure of the petitioner to separate its single community exchange operation for accounting purposes into two businesses divided by the city lines.

The second ground of decision seems to derive from that part of the respondents' plea in abatement based on the alleged failure of the petitioner to exhaust the possibilities of negotiation with the City authorities prior to instituting suit. In this behalf the appellate court states: "It is probable that the trial court concluded that the 100 per cent increase requested was more than the statute, Art. 1119, supra, authorized, and that the 10 per cent increase refused by appellant (petitioner company) would have been adequate."

■ As to the first ground, we find nothing in the instant record to cause us to favor the separation theory here while rejecting it as we did in the Wellington case. Indeed, the point is not clearly alluded to by the respondents in their pleadings or in their brief as appellees in the Court of Civil Appeals. Neither Texas-Louisiana Power Co. v. City of Farmersville, Texas Comm. App., 67 S.W. 2d 235, nor Kousal v. Texas Power & Light Co., 142 Texas 451, 179 S.W. 2d 283, cited by the court below, involved even remotely this kind of question. That part of their language, which seems to be deemed relevant, amounts to no more than a general descriptive reference to Art. 1119, supra, as being a legislative delegation "to municipal corporations" of "the power to regulate and fix rates to be charged by public utilities operating within their limits." (67 S.W. 2d 238-9). This is far from saying that if, for example, in the case of a communtiy exchange like the present, the central office building were located on the city limit line, the city council could consider in connection with rates to be charged city resident subscribers only the value of that portion resting within the city, or that where portions of the exchange lines lie beyond the city limits enabling city residents to call and be called by suburban residents without long distance formalities and

charges, such properties are to no possible extent "property used and useful" in rendering company service to city subscribers (Art. 1119, supra).

Possibly in connection with the foregoing question, the respondents seem to attach primary importance to their position that the service was poor and the suburban lines in poor condition. Indeed, it would not be unnatural if the entire exchange were somewhat "antiquated," considering that admittedly there has been only the one increase in rates granted by the 1952 ordinance—amounting to 33.5 per cent—since 1927, that is, in a period of some 28 years up to the time of trial, during which it is common knowledge that there has been an increase of business costs of almost every kind, including wages, construction and material and taxes, amounting to far more than 33.5 per cent. Whether this line of argument be logically relevant toward requiring a separation of accounts along city limit lines or is merely intended as an attack on the accuracy of the company figures for the exchange as a whole, the respondents themselves presented neither allegations nor proof of inadqeuate service of any sort other than the altogether general recitals of the above-mentioned amended minutes adopted ex parte after the institution of this suit and other than sundry unsworn observations made by the city attorney himself while cross examining the petitioner's witnesses. The valuation expert for the petitioner did concede without hesitation that a certain three-mile portion of the suburban lines was in poor condition, but there was no indication that this was overvalued or otherwise adversely affected the total valuation, which the witness swore without contradiction to be reasonable and proper, or that it had any appreciably adverse effect on the quality of the service or somehow resulted in discrimination against the city subscribers.

■ The second ground taken by the court below—that the trial judge may have concluded (a) that the alleged demand of the petitioner for a 100 per cent increase was too high in view of the return limits provided in Art. 1119, supra, or (b) that the allegedly proffered increase of 10 per cent would give an adequate return—we likewise disposed of in the Wellington case, doing so on the theory stated in City of Houston v. Southwestern Bell Tel. Co., Texas Civ. App., 263 S.W. 2d 169, wr. of er. refused, that the issue in cases like that and the present is the validity of the rates sought to be enjoined and not that of rates which the petitioner may have asked for or refused to accept. Indeed, to say that a small increase was deemed ade-

quate is to say in effect that, at least to that extent, the existing rates were inadequate.

The points made by the respondents as appellees below to the effect that "There are no pleadings and no evidence that the telephone rates set by the City of Eden were invalid when they were established" (1952) and that "the change of status presented to the Court should have first been submitted to the proper rate making tribunal" are shown by the supporting argument to be together but a purported application of a holding in the Lone Star Gas Co. case, (137 Texas 279). In that case we said that "on this record" the issue to be tried upon the remand was the validity of the gas rates in question at the time of the Railroad Commission order which established them and not in the light of developments which had occurred well after the suit attacking the order had been filed. The reason given by the court for its conclusion was that "Article 6059 and allied statutes clearly contemplate that the commission should be given an opportunity to pass on questions of unreasonableness and unjustness, and confiscation, before such questions are presented for judicial determination." (See 137 Texas 279, 312-313, 153 S.W. 2d 681, 699).

Although the statutes concerning establishment and judicial review of gas rates are so different from the terms of Art. 1119, supra, and the nature of the Railroad Commission is so different from that of a small town city council, that the rule above quoted may well be inapplicable to the present case for that reason, the petitioner company in any event undoubtedly sought a substantial rate increase from the respondents a few months prior to instituting this suit and upon the ground that the existing rates were then inadequate. It certainly was not required to do more than this in order to invoke present day conditions in its suit following its unsuccessful recourse to the Council.

3  The respondents' remaining point in the Court of Civil Appeals is to the effect that the petitioner failed to show that it "is suffering any greater hardship than" the respondent City, for the reasons (a) that the latter was in an area suffering from a severe drouth and (b) that the petitioner "is in the 52 per cent income bracket over its entire system as a whole." No authority is cited, and we know of none, which entitles courts to refuse injunctive relief against inadequate rates, because some, or even all, of the customers of the utility in question may at the time be less able to pay the proper charges than they ordinarily would be. The "52 per cent income bracket," of

course, includes all corporations, however large their investment, that earn over a total of $25,000 per year and thus has no significance as to corporate prosperity or adversity even in general, still less with respect to a particular subdivision of the corporation such as the Eden exchange, as to which latter several of the respondents admitted that it was making less than a fair return.

The point made in the City of Wellington case to the effect that rates may be enjoined in the absence of an appropriate review statute only where they result in a net loss to the utility is also made by the respondents in this court. We overrule it, first, on the legal ground stated in the Wellington case and, secondly, on the ground that, in the instant case, a net loss was, under the uncontradicted affidavits and evidence of the petitioner, actually suffered.

Concerning the case as a whole, what we said in the latter part of the opinion in the Wellington case as to discretionary authority of the trial court is largely applicable here. The sworn allegations and proof of the petitioner as to the valuation of its properties and the return it received thereon were in effect uncontroverted, and the respondents even admitted that an increase in the rates in suit was justified. There was no inherent improbability in the petitioner's allegations and proof.

It is now said, although the point was not made in the Court of Civil Appeals, that because there was no specific statement in the testimony that all disbursements and charges against income reflected by the petitioner's accounts were "reasonable," the injunction was properly denied. The sworn pleadings of the petitioner categorically stated that such charges and expenditures were reasonable and necessary and that the exchange was operated in a prudent and efficient manner. The testimony that petitioner's accounts were properly kept in accordance with regulations of the Federal Communications Commission and were regularly audited by independent auditors was not denied. We think the effect of the testimony was that all charges and expenditures were reasonable and necessary.

The trial court should accordingly have isued a temporary injunction as prayed for upon proper bond to be furnished by the petitioner for the protection of its subscribers as well as the respondents against loss in case of dissolution of the injunction on final hearing. The petitioner will thus be protected against irreparable loss pending final judgment, which it would not

otherwise be, while its subscribers and the respondents will enjoy at least substantial protection under the bond; the amount, terms and surety or sureties of which shall, of course, be determined and approved by the trial court as a condition for issuance of the writ.

The judgments of both courts below are reversed and the cause is remanded to the trial court for further proceedings.

Opinion delivered October 3, 1956.