**CITY OF GALVESTON, Texas, Relator,**

v.

**John L. HILL, Attorney General, Respondent.**

No. B–4975.

Supreme Court of Texas.

Feb. 19, 1975.

McLeod, Alexander, Powel & Apffel, Benjamin R. Powel, Galveston, Vinson, Elkins, Searls, Connally & Smith, Victor W. Bouldin and Clifford W. Youngblood, Houston, for relator.

John L. Hill, Atty. Gen., Mike Willatt, Asst. Atty. Gen., Austin, for respondent.

DENTON, Justice.

This is an original proceeding for mandamus instituted by the City of Galveston, Texas against John L. Hill, Attorney General of Texas, to compel him to approve a proposed issuance of $26,000,000 of City of Galveston, Texas Special Contract Revenue Bonds, Series 1973, which will finance construction of a grain elevator in the Galveston harbor area.

The wharves and terminal facilities of Galveston harbor are owned by the City and have been set apart as a separate utility known as the "Galveston Wharves." Pursuant to the City's home rule charter and Section 7, Article 1187f, Vernon's

Tex.Rev.Civ.Stat.Ann., the management and control of the Galveston Wharves has been invested in a board of trustees. In exercising their powers to make contracts as provided in the city charter, the board of trustees executed a construction agreement and an accompanying lease agreement with Cook Terminal Company. These instruments in essence provided that a grain elevator was to be constructed on property owned by Galveston Wharves with the cost of construction of such facility being financed through the issuance of bonds by the City of Galveston and that upon completion, Cook Terminal would lease and operate the facility. The primary term of the lease is for 30 years with Cook Terminal having the option to renew the lease for four successive 5-year terms. If the options are exercised, Cook will have the option to purchase all improvements for $1.00. The rental payments to be made by Cook Terminal are set at a figure sufficient to pay the principal and interest on the bonds with an additional $281,105.00 per year for ground and berth rentals. The Galveston City Council, upon the passing of a resolution approving the above agreements between the board of trustees and Cook Terminal, adopted an ordinance authorizing the issuance of $26,000,000 in revenue bonds. The record relating to the authorization of these bonds was subsequently submitted to the Attorney General for his approval as required by Section 5 of Article 1187f. The Attorney General, after his examination of the accompanying transaction, declined to approve the issuance of the bonds asserting as a reason that there is an improper delegation of governmental powers and duties of the Board of Trustees of Galveston Wharves.

Upon oral argument of this cause, the Attorney General focused his argument primarily upon the assertion that, in view of the pertinent statutory authority, the lease agreement from which the revenue bonds in issue are to be paid, provides for an improper delegation to private individuals of the governmental powers and duties

vested in the Board of Trustees of Galveston Wharves. Section 7 of Article 1187f provides:

> [I]f the city is operating under a Home Rule Charter and said Charter contains provisions requiring that the improvements and facilities be managed or controlled by a board of trustees, then the provisions of such Charter shall be followed.

The City of Galveston, as previously mentioned, is a home rule city and has included in its city charter an article directed at implementation of the above cited statute. As regards the subject of management and control of city-owned wharf and terminal properties, the city charter provides:

> The Galveston Wharves, and the income and revenue therefrom, shall be fully managed, controlled, maintained and operated by a Board of Trustees . . . .
>
> . . . . . . . .
>
> . . . The Board of Trustees shall have those powers . . . as may be required for the proper conduct of the Galveston Wharves, the preparation of budgets, the fixing of charges, the authorization of expenditures, the acquisition of properties, the determination of policies, and, in general, the complete management and control of the Galveston Wharves and the income and revenue thereof . . . . .

In view of this specific pronouncement with reference to the control of harbor facilities, the Attorney General contends that the terms of the lease agreement, which provides for management and control of the grain elevator to be given to Cook Terminal, is in direct conflict with the city charter and consequently, the authorizing statute. The provisions within the lease agreement which the Attorney General has found objectionable in this regard are set out below.

> *Lessee shall have the right to fix and to levy dockage* for ships and barges handling Bulk Commodities at the

Leased Premises or any extension or addition thereto; provided, that such dockage rates shall be reasonable and competitive. . . .

The Leased Premises shall be operated and maintained throughout the initial and any renewal term thereof as a public elevator terminal and material handling facility on a first-come, first-serve, non-exclusive basis serving the general public for the warehousing, storing, marketing, conditioning and shipping of Bulk Commodities, including dry agricultural products. *Lessee shall establish and enforce reasonable rules and regulations in the operation of the Leased Premises* and maintain and operate same in an efficient manner. Lessee further agrees that it will receive for storage in the Leased Premises from any person, firm or corporation within or without the United States of America, insofar as the Leased Premises' capacity and commitments may permit, any grain suitable for storage therein which may be tendered in a suitable condition, in the usual manner and in the ordinary course of business. *Lessee shall maintain and publish rates and charges for the handling and storage of grain upon or within the Leased Premises.* [Emphasis Added].

The City contends that the lease as written does comply with all the statutory and city charter requirements regarding control and management of city-owned wharf and terminal properties by first pointing to express language in both article 1187f and Galveston's city charter that provides for the leasing of such property and facilities. Secondly, it is asserted that the leasing arrangement here utilized most effectively carries out the purposes of Article XVI, Section 59 of the Texas Constitution, Vernon's Ann.St., which was adopted in part to further the development of navigation of the State's coastal waterways. Finally, the City urges that the terms of the lease in question require Cook Terminal to operate the facility publicly and without discrimination, complying with all Federal, State and local laws and regulations and

that such operation will effectively be no different than if the City itself was operating the facility. The City also notes, outside the terms of the lease, that neither the City nor its lessee has rate making power; the power of the facility operator is to propose rates, which, if found discriminatory or unreasonable, are subject to change by the Federal Maritime Commission. The City also points out that it could complain to the Commission if it felt any of the rates proposed by the lessee were unfair or discriminatory.

As to the City's assertion that neither the lessor nor the lessee has any rate making power, this court, in Rorie v. City of Galveston, 471 S.W.2d 789 (Tex.1971), has previously considered the scope of the Federal Maritime Commission's power to pass upon tariffs that are unilaterally promulgated and uniformly applicable. There it was stated that such a tariff

does not fit any of the categories specified in the statute and in our opinion is not governed by its provisions. This is the view of the Commission, which has filed an amicus curiae brief expressing the opinion that the tariff of a terminal operator furnishing services in connection with common carriers by water becomes effective upon filing.

We agree that the grain elevator to be constructed is a special handling facility and that the City was justified in seeking to lease the facility to a private concern so as to secure the special expertise necessary to operate it. The management and control of the facility in such case, however, is to be limited to proprietary affairs and must not involve the redelegation of governmental or legislative functions of the board of trustees. The management of income and revenue from the Galveston Wharves, the setting of rates and the determination of policies, being governmental functions, have been explicitly vested in the discretion of the board of trustees by the city charter, and such cannot be surrendered, delegated or bartered away. Kousal v. Texas Power &

Light Co., 142 Tex. 451, 179 S.W.2d 283 (1944); Nairn v. Bean, 121 Tex. 355, 48 S.W.2d 584 (1932); Altgelt v. City of San Antonio, 81 Tex. 436, 17 S.W. 75 (1890); L. Waterbury & Co. v. City of Laredo, 68 Tex. 565, 5 S.W. 81 (1887); City of Brenham v. Brenham Water Co., 67 Tex. 542, 4 S.W. 143 (1887); Bowers v. City of Taylor, 16 S.W.2d 520 (Tex.Comm'n App.1929, holding approved), motion for rehearing overruled, 24 S.W.2d 816 (Tex.Comm'n App.1930); City of Uvalde v. Uvalde Electric & Ice Co., 250 S.W. 140 (Tex. Comm'n App.1923, jdgmt. adopted); *see* Tex.Const. Art. 1, § 17.

In view of the unrestricted power that has been given to Cook Terminal under the lease agreement in question here to set rates and determine rules and regulations affecting the operation of the proposed public grain elevator, we conclude that the Attorney General was correct in refusing to certify the bonds to finance construction of the facility because of their conflict with the terms of the applicable statute and the resulting improper delegation of governmental powers.

The petition for writ of mandamus is denied.