PAIR–A–DICE ACQUISITION
PARTNERS, INC.,
Plaintiff,

v.

The BOARD OF TRUSTEES OF The
GALVESTON WHARVES and the
Galveston Wharves, Defendants.

No. CIV.A.G–01–300.

United States District Court,
S.D. Texas,
Galveston Division.

Feb. 5, 2002.

Paul J. Dobrowski, Dobrowski & Associates, Houston, TX, for plaintiff.

Douglas W. Poole, McLeod Alexander et al., Galveston, TX, William Scott Helfand Magenheim, Houston, TX, for defendants.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION TO STRIKE

KENT, District Judge.

Plaintiff Pair–A–Dice Acquisition Partners, Inc. ("Pair–A–Dice") brings this lawsuit against the Board of Trustees of the Galveston Wharves and the Galveston Wharves (collectively, "the Port") pursuant to 42 U.S.C. § 1983 and Texas state law.[1] Now before the Court is the Port's Motion for Summary Judgment on all of Pair–A–Dice's claims, filed October 31, 2001, and Pair–A–Dice's Motion to Strike portions of the Port's Motion for Summary Judgment and portions of an Affidavit accompanying that Motion, filed January 18, 2002. For the reasons articulated below, the Port's Motion for Summary Judgment is hereby **GRANTED** in all respects and Pair–A–Dice's Motion to Strike is hereby **DENIED**.

### I. Background

For over a decade, the Port has sought a long-term agreement with a viable and

---

1. The Galveston Wharves (the Port of Galveston) is managed by the seven-member Board of Trustees of the Galveston Wharves. Pair–A–Dice has named both the Galveston Wharves and the Board of Trustees of the Galveston Wharves as Defendants in this action. The Court notes that, for all practical purposes, the Galveston Wharves and its governing Board of Trustees are the same entity. Thus, the instant Motion for Summary Judgment, filed by the Board of Trustees, will be treated as a Motion filed on behalf of both the Board of Trustees and the Galveston Wharves. As noted above, the Court will refer to both entities collectively as "the Port."

competent gaming operator by which the operator would obtain and operate a gaming vessel from Galveston on a year-round basis. In November 1999, the Port entered into a six-month option agreement with Talisman Cruises, L.L.C. ("Talisman") to execute a long-term operating agreement for a gaming vessel at Galveston's Pier 21. Despite the fact that the option agreement was extended for an additional six months on April 24, 2000, Talisman never exercised its option. Consequently, Talisman's option terminated in November 2000.

The Port was still actively engaged in negotiations with Talisman at the start of 2001. However, after more than fifteen months, Talisman had not yet secured a properly outfitted vessel. Therefore, the Port resolved to seek out additional entities with the desire and means to operate a gaming vessel in Galveston. On January 22, 2001, the Port publicly voted to issue a Request for Qualifications ("RFQ") for the purpose of soliciting additional gaming proposals from qualified individuals and incorporated entities.

The Port issued the RFQ on March 2, 2001. The RFQ invited qualified individuals and entities to tender proposals for an exclusive, five-year operating agreement for the operation of a day-cruise gaming vessel from the Port. Moreover, it expressly stated that the validity of the operating agreement would depend upon the gaming vessel being delivered to Galveston operationally ready to commence the cruises. The RFQ provided that all respondents "must have demonstrated experience in vessel operations and, specifically, in Day-Cruise Gaming Vessel Operations and must meet all criteria/requirements identified in the RFQ."

The RFQ also outlined the method by which the Port would review properly submitted proposals. Specifically, the RFQ provided that "[t]he Port . . . will review all of the Proposals . . . received [by 2:00 p.m. on Friday, March 23, 2001]. The Port . . . will determine which Offeror is deemed to have submitted the Proposal most attractive to and beneficial for the Port and the City of Galveston. Concurrent with the review of the Proposals will be a process of Due Diligence with respect to the Proposals, and all information contained therein, submitted by the Offerors. The determination of which Offeror will be recommended to the Board . . . will be predicated, in part, upon and conditional to the receipt of positive results from the Due Diligence process. Upon successful completion of the Due Diligence and proposal review, the Port of Galveston staff will make a recommendation to the Board . . . for their consideration and action. Every effort will be made by the Port . . . to have a recommendation for the Board of Trustees completed in time for discussion and action . . . on April 23, 2001." The RFQ also stated, in bold print, that "[t]he Board . . . reserves the right to accept or reject any or all Proposals received in conjunction with this request and to accept the Proposal which best serves the interests of the Port and City of Galveston."

On March 23, 2001, Pair–A–Dice tendered a proposal in response to the RFQ.[2] Pair–A–Dice's proposal characterized the company as "newly formed," indicated that Pair–A–Dice lacked "historical data [and] operational history" and disclosed the fact that Pair–A–Dice had "not formed a bank-

---

**2.** Pair–A–Dice's response was the sole proposal submitted in response to the RFQ by the stated deadline. Notably, Talisman submitted a "No Response" letter in lieu of a proposal. In that letter, Talisman provided the following explanation for why it was not submitting a proposal: "We believe that we properly exercised our option to enter into a previously negotiated berthing agreement at Pier 21. The Port disagrees."

ing relationship" in Galveston as of that date. Along with its proposal, Pair–A–Dice submitted a cover letter written by its President and Chief Executive Officer, Stephen Primak ("Primak"). Primak's letter noted that "some of the information [in the proposal] may not be complete to your satisfaction."

While the Port was awaiting responses to the RFQ, Talisman managed to acquire a gaming vessel. In light of this new development, the Port decided to enter into a series of ten-day non-exclusive berthing applications with Talisman. The first of these berthing agreements was executed on March 26, 2001 with the possibility of renewal. The Port's berthing arrangement with Talisman was *not*, however, the long-term, exclusive operating agreement contemplated by the RFQ.[3]

While Talisman's gaming operation was underway in Galveston on non-exclusive terms, the Port began its due diligence on Pair–A–Dice's proposal for an exclusive arrangement. The Port reviewed Pair–A–Dice's submission, considered the type of vessel that was proposed, attempted to determine whether Pair–A–Dice's presentation was suitable and questioned whether the materials submitted in the RFQ were complete. Nonetheless, the Port was unable to finish its due diligence by the RFQ's suggested completion date (April 23, 2001) because Pair–A–Dice's proposal was incomplete. Consequently, the Port

responded to Pair–A–Dice's proposal on April 27, 2001 in a letter written by Capt. John G. Peterlin III, Senior Director of Marketing Services for the Port. The stated purpose of the letter was to provide an "update regarding the Port staff's review of your submission." The letter notified Pair–A–Dice that the Port's primary concern with its submission was Pair–A–Dice's "lack of audited or certified yearly financial statements that demonstrate [Pair–A–Dice's] ability to bring a viable gaming operation to the Port of Galveston." The letter also highlighted the fact that Pair–A–Dice's proposal failed to include "a firm timetable for the implementation of [Pair–A–Dice's] operation."

In his written response to the Port's letter, Primak stated that "once I am confident that the Port is seriously considering [Pair–A–Dice's] proposal, I will be happy to provide the Port with audited financial statements." The Port did not answer Primak's response and Primak never submitted the requested information to the Port for review. As a result, the Port was unable to complete its due diligence on Pair–A–Dice's proposal. At the Port's subsequent meeting on July 23, 2001, the Port staff recommended to the Board that Pair–A–Dice's proposal be rejected. Thereafter, the Port voted unanimously to reject Pair–A–Dice's proposal and informed Pair–A–Dice of such by a letter dated that same day.[4]

---

3. In its Response to the Port's Motion for Summary Judgment, Pair–A–Dice makes much of the fact that Port entered into these berthing agreements before it reached a final decision regarding a long-term, exclusive operating agreement with Pair–A–Dice. However, the Court reminds Pair–A–Dice that the Port also entered into these berthing agreements before it reached a final decision regarding any long-term, exclusive operating agreement with Talisman. These non-exclusive berthing agreements were markedly different from the type of operating agreement contemplated by the terms of the RFQ.

4. Ultimately, neither Talisman nor Pair–A–Dice entered into an exclusive, long-term operating agreement with the Port. Furthermore, when Talisman ceased its payment of dockage fees on July 4, 2001, the Port's non-exclusive relationship with Talisman ended in disaster. This Court ordered and supervised the subsequent seizure and sale of Talisman's vessel. Talisman's many creditors are still awaiting resolution of their claims against the company.

Katherine D. Moore, the Port Director, avers that Pair–A–Dice's proposal was rejected for many reasons including its failure to provide historical data, an audited balance sheet, certified financial statement or any other financial data. Moore also avers that Pair–A–Dice did not own or lease the vessel mentioned in its proposal and "even if a vessel could have been acquired, the Port had doubts about the vessel's adequacy." Finally, Moore declares that "[i]n the judgment of the staff and the Board, Pair–A–Dice did not satisfactorily prove the character, financial capability or experience that the Wharves required for an exclusive, long-term contract." Pair–A–Dice did not wait until its proposal was formally rejected, however, to file this lawsuit. Rather, on May 23, 2001, Pair–A–Dice brought this action against the Port, alleging that because the Port had entered into an operating agreement with Talisman on March 26, 2001, Defendants were liable to Pair–A–Dice under state law fraud and breach of contract causes of action.[5]

## II. Legal Standard

A Court may grant summary judgment where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). When one party moves for summary judgment, the nonmoving party must set forth specific facts that show the existence of a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Issues of material fact are "genuine" only if they require resolution by a trier of fact. *See id.* at 248, 106 S.Ct. at 2510. Therefore, the mere existence of some alleged factual

dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. Rather, only disputes over facts that might affect the outcome of the lawsuit under governing law will preclude the Court's grant of summary judgment in favor of the moving party. *See id.* at 247–48, 106 S.Ct. at 2510. Nevertheless, if the evidence is such that a reasonable fact-finder could find in favor of the nonmoving party, summary judgment should not be granted. *See id.; see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Dixon v. State Farm Fire & Cas. Co.,* 799 F.Supp. 691 (S.D.Tex.1992) (noting that summary judgment is inappropriate if the evidence could lead to different factual findings and conclusions). The tasks of determining credibility, weighing evidence, and drawing reasonable inferences are reserved for the trier of fact. *See Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513.

## III. Breach of Contract

Under Texas law, a plaintiff seeking a recovery for breach of contract must prove (1) the existence of a contract; (2) performance or tendered performance by the plaintiff; (3) breach by the defendant; and (4) damages sustained by the plaintiff as a result of the defendant's breach. *See Hussong v. Schwan's Sales Enters., Inc.,* 896 S.W.2d 320, 326 (Tex. App.-Houston [1st Dist.] 1995, no writ). In order to have a binding and enforceable agreement, there must be an offer and an acceptance. *See Williford Energy Co., v. Submergible Cable Serv., Inc.,* 895 S.W.2d 379, 384 (Tex.App.-Amarillo 1994, no writ). Generally, where the existence of a contract is disputed, the issue of whether the parties reached an agreement is a question

---

**5.** Pair–A–Dice's Third Amended Complaint, filed August 1, 2001, also alleges a deprivation of civil rights under 42 U.S.C. § 1983.

of fact. *See Preston Farm & Ranch Supply, Inc. v. Bio–Zyme Enters.*, 625 S.W.2d 295, 298 (Tex.1981). However, even where a plaintiff presents particular proof of a contract's existence, such proof may be insufficient, as a matter of law, to create a contract. *See Montgomery County Hosp. Dist. v. Brown*, 965 S.W.2d 501, 502 (Tex. 1998).

■ This is such a case. As the Port rightfully argues in its Motion for Summary Judgment, Pair–A–Dice cannot, as a matter of law, satisfy the first element of a breach of contract claim (the existence of a contract). The undisputed summary judgment evidence conclusively establishes that the Port never accepted Pair–A–Dice's offer to conduct a gaming operation in Galveston. Thus, even indulging every inference in favor of Pair–A–Dice, the summary judgment record does not yield a genuine issue of material fact as to whether Pair–A–Dice and the Port entered into a contract. Therefore, the evidence upon which Pair–A–Dice relies is wholly insufficient, as a matter of law, to create the existence of an enforceable agreement.

■ Nevertheless, although Pair–A–Dice cannot prove the existence a contract, the Court must also address the alternative theory of promissory estoppel.[6] Promissory estoppel is an equitable doctrine which "does not create a contract where none existed before," but rather, supplies a remedy to enable an injured party to be compensated for its foreseeable, definite and substantial reliance. *Wheeler v. White*, 398 S.W.2d 93, 96–97

(Tex.1965). Although promissory estoppel is normally a defensive theory, Texas law provides that it is an available cause of action for a promisee who acted to its detriment in reasonable reliance on an otherwise unenforceable promise. *See id.*

■ To prevail on its assertion of promissory estoppel at trial, Pair–A–Dice must show the existence of: (1) a promise; (2) foreseeability by Defendants that Pair–A–Dice would rely upon the promise; and (3) reliance upon the promise to Pair–A–Dice's detriment. *See English v. Fischer*, 660 S.W.2d 521, 524 (Tex.1983). Central to the definition of promissory estoppel is the notion that the promise at issue was not carried out as guaranteed, hence, the detrimental reliance. In this case, the promises at issue are the stipulations in the RFQ requiring the Port to "(1) determine which response to the RFQ was most attractive and beneficial to the Port and the City of Galveston; (2) conduct due diligence regarding the responses to the RFQ; (3) following the completion of due diligence, make a recommendation to the Board for action to choose a successful respondent; (4) negotiate an operating agreement only after making a recommendation to the Board; and (5) make every effort to make the recommendation to the Board by April 23, 2001." Pair–A–Dice claims that it relied upon these promises and was injured when the stipulated procedures were not properly implemented.

■ Pair–A–Dice's argument is fatally flawed, however, because the summary

---

**6.** Although Pair–A–Dice fails to use the term "promissory estoppel" to describe its theory of recovery, it alleges its breach of contract claim in terms of its reliance on a promise. As such, the Court assumes that Pair–A–Dice intended to plead promissory estoppel as an alternative theory of recovery and will consider the merit of such an argument. However, the Court finds no need to address Pair–A–Dice's lengthy discussion regarding lost profit

damages. A party's damages based upon promissory estoppel are "not measured by the profits that such party's reliance led him to expect, but instead are limited to the amount necessary to compensate that party for a loss already suffered." *Sun Oil Co. v. Madeley*, 626 S.W.2d 726, 734 (Tex.1981), i.e. the cost of submission of a *completed* bid proposal (which in fact was never submitted).

judgment evidence proves beyond any doubt, or even viable suggestion, that the Port acted in accordance with the procedures outlined in the RFQ. Simply put, there was no broken promise. The Port carried out its first and third stipulated responsibilities on July 23, 2001 when it determined that Pair–A–Dice's proposal (the only response to the RFQ received) was not the most attractive and beneficial to the Port and the City of Galveston and recommended that Pair–A–Dice's proposal be rejected. Next, as evidenced by the Port's April 27, 2001 letter to Primak, the Port accomplished its second stipulated responsibility when it expended reasonable efforts to conduct due diligence on Pair–A–Dice's proposal. The due diligence was halted because the "Port staff [needed] a detailed explanation of [Pair–A–Dice's] plan of finance prior to any further proposal evaluation," and because the Port "need[ed] additional financial and time-line information regarding sources and uses of funds and the specific tasks (with associated costs) that [had to] be undertaken to meet [Pair–A–Dice's] estimated fourteen-week project completion." Pair–A–Dice concedes that it *never* furnished the requested information to the Port. Thus, Pair–A–Dice, not the Port, is solely responsible for any inadequacies in the due diligence process.

Likewise, Pair–A–Dice's claim that the Port failed to negotiate an operating agreement only after making a recommendation to the Board has no merit. Although the Port did enter into an operating agreement with Talisman on March 26, 2001, the Talisman agreement was not the type of operating agreement contemplated by the RFQ. The RFQ and the stipulations contained therein applied to an exclusive long-term operating agreement. While readily acknowledging that the Port would have failed to abide by its stipulated procedures if had entered into an exclusive long-term operating agreement with Talisman before the Port staff made its recommendation to the Board, the Court emphasizes that such a scenario did *not* occur. Instead, the Port entered into a series of short-term non-exclusive berthing agreements with Talisman. Clearly, the Port did not violate the fourth stipulated procedure outlined by the RFQ.[7]

Finally, the summary judgment evidence shows that the Port staff made a reasonable effort to prepare a recommendation to the Board by April 23, 2001. The RFQ expressly stated that the recommendation would be made "[upon] successful completion of the Due Diligence . . .[and]. . . be predicated, in part, upon and conditional to the receipt of positive results from the Due Diligence process." In Pair–A–Dice's

---

7. The Court notes that Pair–A–Dice has presented summary judgment evidence suggesting that the Port may have been attempting to enter into a long-term exclusive agreement with Talisman before completing due diligence on Pair–A–Dice's proposal. Nevertheless, the reality of the matter is that no such agreement with Talisman was ever reached. The Port attempted due diligence on Pair–A–Dice's proposal as promised and formulated a recommendation as stipulated. Thereafter, on July 23, 2001, the Port's recommendation was submitted to the Board. Without a doubt, the Port performed as promised. Once again, the fact that the Port concurrently entered into a series of non-exclusive berthing agreements with Talisman while reviewing Pair–A–Dice's proposal is irrelevant to this lawsuit. The Port *never promised* that it would refrain from entering into a non-exclusive agreement while shopping for an exclusive one. As such, the activity that Pair–A–Dice primarily complains of (the Port's berthing agreements with Talisman) does not constitute actionable conduct. The Port was acting within its rights (and trying to increase much-needed revenue for Galveston citizens) when it availed itself of the opportunity to enter into a non-exclusive, short-term berthing agreement while continuing to contemplate proposals for a long-term exclusive arrangement.

case, however, no such "positive results" existed. As previously stated, the Due Diligence process was never completed. Thus, the Port was forced to abandon its attempted review of Pair–A–Dice's proposal. Hence, the undisputed evidence shows that the Port was prevented from making "every effort" to have a recommendation ready by April 23, 2001 by Pair–A–Dice's own actions.

In sum, the summary judgment evidence demonstrates, as a matter of law, that no issue of material fact exists with respect to whether the Port and the Board abided by the terms of the RFQ. Accordingly, because (1) no contract existed between Pair–A–Dice and Defendants, as a matter of law, and because (2) Pair–A–Dice's promissory estoppel theory fails, as a matter of law, Defendants' Motion for Summary Judgment is hereby **GRANTED** with respect to Pair–A–Dice's breach of contract claim.

### IV. Common Law Fraud

■ The doctrine of sovereign immunity, unless waived, protects the State of Texas, its agencies and its officials from lawsuits for damages, absent legislative consent to sue the state. *See Missouri Pac. R.R. v. Browns Navigation Dist.*, 453 S.W.2d 812, 813 (Tex.1970). Municipalities, such as the City of Galveston, are created as political subdivisions of the State as a means for the exercise of the powers that are granted to them by the State. *See City of Lancaster v. Chambers*, 883 S.W.2d 650, 658 (Tex.1994) ("A municipality, as a political subdivision of the state, is not liable for the acts or conduct

of its officers or employees unless the municipality's common law immunity is waived by the Texas Tort Claims Act"); *see also City of Amarillo v. Pruett*, 44 S.W.3d 702, 707 (Tex.App.-Amarillo 2001, no pet.). Municipalities "represent no sovereign distinct from the state and possess only such powers and privileges as have been expressly or impliedly conferred upon them." *Payne v. Massey*, 145 Tex. 237, 196 S.W.2d 493, 495 (1946).

■ The State has accorded certain municipalities that own or operate a port the power to "construct, acquire, lease, improve, enlarge, extend, repair, maintain, replace, develop, or operate a port improvement or facility." Tex. Transp. Code § 54.003(a); *see also Lake Charles Harbor and Terminal District v. Bd. of Trustees of the Galveston Wharves*, 62 S.W.3d 237, 246 (Tex.App.-Houston [14th Dist.] 2001, no pet.).[8] This power is a "public and governmental function, [that] is exercised for a public purpose, and is a matter of public necessity." Tex. Transp. Code § 54.003(a). Moreover, this power may be vested in a governing board. *See* Tex. Transp. Code § 54.051(a). The City of Galveston has placed its wharf and terminal facilities under the management of the Port. *See* Galveston, Tex., Charter, art. XII, §§ 1–2 (designating Galveston Wharves as a "separate utility" of the City of Galveston to be managed by the Board); *see also Galveston v. Hill*, 519 S.W.2d 103, 105 (Tex.1975) (noting that the Board of Trustees of the Galveston Wharves has been explicitly vested with governmental

---

**8.** The Texas legislature has determined that this power is available only to a municipality that: (1) is located on: (A) the Gulf of Mexico; or (B) a channel, canal, bay, or inlet connected to the Gulf; and (2) has a population of more than 5,000. *See* Tex. Transp. Code § 54.001. Galveston is located on the Gulf of Mexico and, according to the most recent data available from the United States Census Bureau, has a population of 57,247. Thus, Galveston qualifies as a municipality for purposes of § 54.001. *See Times Atlas of the World: Comprehensive Edition Plate 112* (John C. Bartholomew et al. eds., 1983); Profile of Population, Housing Units, Area and Density: 2000 (Galveston City, Texas), at http://factfinder.census.gov/servlet/GCTTable?_ts=30649218437.

functions). Therefore, the Port is a governmental unit and as such, is protected from tort liability regarding its operation of the port facilities by the doctrine of sovereign immunity.[9] The Court further concludes that, because entering into an operating agreement with a day-cruise gaming vessel involved the lease and development of port facilities, the doctrine of sovereign immunity shields the Port from Pair–A–Dice's allegations of fraud. As such, the Board's Motion for Summary Judgment is hereby **GRANTED** with respect to Pair–A–Dice's common-law fraud claim.

### V. Procedural Due Process

■ To prevail on a 42 U.S.C. § 1983 claim for deprivation of procedural due process, a plaintiff must first establish the existence of a property interest that is protected by the Due Process Clause of the Fourteenth Amendment. *See Bd. of Regents v. Roth,* 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972). Property interests are not created by the Constitution. Rather, property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source." *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709. The "independent sources" giving rise to property interests include state statutes, local ordinances, existing rules, contractual provisions or mutually explicit understandings. *See id.; Perry v. Sindermann,* 408 U.S. 593, 602, 92 S.Ct. 2694, 2700, 33

L.Ed.2d 570 (1972). "Mutually explicit understandings" generally include implied contracts and supplements to written agreements. *See Jago v. Van Curen,* 454 U.S. 14, 17–18, 102 S.Ct. 31, 34, 70 L.Ed.2d 13 (1981).

### *Texas Competitive Bidding Requirements*

■ Pair–A–Dice argues that Texas competitive bidding laws creates a protected property interest in "the expectation that governmental officials will follow the law and perform their own promises." However, Tex. Loc. Govt.Code § 252.042 and Tex. Loc. Govt.Code § 252 .043 (the statutes cited by Pair–A–Dice in support of its alleged property interest) apply solely to situations where municipalities are *expending* more than $25,000.00 from municipal funds. *See* Tex. Loc. Govt.Code § 252.021. Put another way, Texas competitive bidding laws do not apply in a situation where a municipality is requesting proposals for a revenue-generating agreement that does not call for an expenditure by the municipality. Therefore, because there is no evidence before the Court indicating that the Port was going to expend more than $25,000.00 (or any money at all, for that matter) pursuant to 'the operating agreement contemplated by the RFQ, the Texas competitive bidding laws cited by Pair–A–Dice do not provide a basis for a cognizable property interest in this scenario.[10]

---

9. Absent the use of clear and unambiguous language, there can be no waiver of sovereign immunity. *See Missouri Pacific,* 453 S.W.2d at 813. Pair–A–Dice makes no reference to any language purporting to act as a waiver of immunity. Accordingly, the Court concludes that no waiver exists.

10. Pair–A–Dice also argues that Tex. Attny. Gen. Op. MW–344 (1981), an opinion that instructed the Port to receive competitive bids in order to award a contract to a private

entity that would operate container terminal facilities, requires the Port to receive competitive bids in this lawsuit. This argument is erroneous, however, because the Port was not receiving bids at all in this case, competitive or otherwise. As discussed above, the Port was not awarding a contract by which the Port would expend money. Rather, the Port was merely accepting proposals regarding a possible operating agreement under which the Port would *receive* money from the gaming day-cruise operation selected.

*Mutually Explicit Understandings*

Pair–A–Dice relies on more than the bidding statues to create its alleged property interest under § 1983. Pair–A–Dice also asserts that its property interest in "the expectation that governmental officials will follow the law and perform their own promises" arose from the "Port's own stipulated procedures." While the Court acknowledges that the stipulations at issue may fall within the definition of a "mutually explicit understanding" supporting Pair–A–Dice's "claim of entitlement to a benefit," *Perry.* 408 U.S. 593 at 602, 92 S.Ct. at 2700, 33 L.Ed.2d 570, the Court does not need to categorize the stipulations as such today. The summary judgment evidence proves that no issue of material fact exists with respect to whether the Port followed its own stipulated procedures. Therefore, the Court concludes that, even if the Port's own stipulated procedures conferred a property interest upon Pair–A–Dice (and the Court certainly is not holding as such), it is overwhelmingly clear from the record that Pair–A–Dice was not deprived of that property interest in any manner at any time. Accordingly, the Port's Motion for Summary Judgment is hereby **GRANTED** with respect to Pair–A–Dice's 42 U.S.C. § 1983 claim for deprivation of procedural due process.

## VI. Equal Protection

 In order to maintain its equal protection claim under the Fourteenth Amendment, Pair–A–Dice must allege that it was treated differently from another similarly situated party. *See Maritrend, Inc. v. The Galveston Wharves,* 152 F.R.D. 543, 552 (S.D.Tex.1993). Pair–A–Dice completely fails to satisfy this requirement, however, because it merely alleges that the Port had a "predetermined and unlawful preference in favor of one bidder over another," without providing *any* evidence of a similarly situated party. In fact, by expressly stating that "Pair–A–

Dice was the only Offeror to respond to the RFQ," Pair–A–Dice clearly acknowledges that there was no other "Offeror." As such, there was no other "similarly situated" party who could have possibly been subject to differential treatment by the Port. Accordingly, because Pair–A–Dice's allegation in support of its equal protection claim completely fails to support a cause of action under § 1983, the Port's Motion for Summary Judgment on Pair–A–Dice's equal protection claim is hereby **GRANTED**.

## VII. Declaratory Judgment

Lastly, Pair–A–Dice seeks a declaratory judgment that the March 26, 2001 agreement between the Port and Talisman is void. Given that Talisman's gaming ship has been seized, sold and no longer operates in Galveston, Pair–A–Dice's request for a declaratory judgment is hereby **DENIED** as moot.

Ultimately, the Court concludes that summary judgment is warranted on all of Pair–A–Dice's claims against the Port. Furthermore, after carefully considering Pair–A–Dice's Objections to the Port's Motion for Summary Judgment and the Affidavit of Katherine D. Moore, the Court finds that Pair–A–Dice's objections are respectfully **OVERRULED**. Consequently, Pair–A–Dice's Motion to Strike Portions of the Port's Motion for Summary Judgment and the Affidavit of Katherine D. Moore is hereby **DENIED**. Each and all of Pair–A–Dice's claims are therefore **DISMISSED WITH PREJUDICE**. Each Party is hereby **ORDERED** to bear its own costs, including attorneys' fees, incurred herein to date.

**IT IS SO ORDERED.**