**NATIONAL LIVING CENTERS, INC., Appellant,**

v.

**CITIES REALTY CORPORATION, Appellee.**

No. 8878.

Court of Civil Appeals of Texas, Texarkana.

June 16, 1981.

James S. Moss, Cole & Moss, Bonham, Larry Huelbig, Houston, for appellant.

Sloan B. Blair, John F. Gray, Cantey, Hanger, Gooch, Munn & Collins, Fort Worth, for appellee.

CORNELIUS, Chief Justice.

National Living Centers brought this action for damages against Cities Realty Corporation, asserting that Cities had breached a real estate lease by failing to timely and properly comply with a provision of the lease which allegedly required Cities to make certain repairs. After National presented its case in a jury trial, the trial court withdrew the case from the jury and rendered a take nothing judgment.

The lease was executed on May 16, 1972, with Cities as lessor and National as lessee. It provided for a term of 10 years from June 15, 1972, and covered premises which were to be used as a geriatrics hospital or nursing home. National is an experienced owner and operator of several nursing homes. A state license was required in order to operate the structure as a skilled care nursing home, and the license could not be obtained until the structure met certain physical requirements and received approval from the State Department of Health. After the departure of the former tenants and prior to the execution of the lease with National, Cities performed certain work on the structure in order to attempt to bring it to licensing standards by complying with two deficiency reports which had been issued by the Department of Health. The president of Cities, James Luttrell, testified that at the time the lease was signed his company had done everything necessary to prepare the facility for licensing. Cities' Exhibit No. 2 shows that by April 21, 1972, the premises qualified for licensing except for a few minor deficiencies such as the lack of certain lights and a nursing call system. However, Frank Frech, Director of Health Planning for National, testified that the facility was not ready for licensing as a skilled care nursing home from around the time the lease agreement was signed in April of 1972 all the way through September of 1974. From July 3, 1973, through September 4, 1974, National sent seven (7) letters to Cities demanding that it make the necessary repairs to enable National to obtain the license, or attempt to obtain the license itself, and also seeking restitution for National's alleged lost profits and damages due to the delay in obtaining the license. Subsequent to the execution of the lease in May of 1972, the premises stood vacant and unlocked and had deteriorated since some of the earlier inspections. Cities ultimately began a second round of repairs in December of 1973 or January of 1974 and they were completed in January of 1975. The license was obtained on February 15, 1975. National initially requested application forms for a license on September 13, 1973, but it did not actually submit its application to the department of health until May 22, 1974. The license was mailed to the nursing home by letter dated January 21, 1975, and National actually began operating the facility as a nursing home in May of 1975.

The lease contained two provisions concerning repairs. One pertains to repairs necessary to secure a license. It provided as follows:

> "12th. National Living Centers, Inc., known hereafter as Lessee, shall attempt to license for skilled nursing care the above described facility for a seventy (70)

bed convalescent home through the proper State and Local agencies. In the event National Living Centers, Inc., is unable to have said facility licensed for skilled nursing care for a seventy (70) bed facility, they will permit Cities Realty Corporation of Fort Worth, Texas, to attempt to secure and acquire all proper licensing of both State and Local Government. This contingency shall be made a part of this lease and should Lessee or Lessor be unable to acquire said necessary license to operate facility as a convalescent home for skilled nursing care for seventy (70) beds, then said Lessee and Lessor shall attempt to secure licensing for a convalescent home of less than seventy (70) beds. In the event that the facility is licensed for less than seventy (70) beds, the rent will be adjusted by the following formula:

$$\text{Rent} \times \frac{\text{Number of beds licensed for Skilled Nursing Care}}{70} = \text{Adjusted Rent}$$

If less than 65 can be licensed for skilled nursing care this lease will be considered cancelled, null and void and of no further force and effect. *Any alterations or repairs, required for said licensing will be at the expense of the Lessor.*" (Emphasis supplied.)

The other provision relating to repairs concerned those necessary to *maintain* the premises in a condition meeting state requirements. Here we are concerned only with the provision concerning repairs necessary for *initial licensing*. The trial court concluded that the provision requiring Cities to pay for the repairs did not impose upon it the affirmative duty to make such repairs, and also concluded that National failed to produce probative evidence that it suffered any damages. National asserts six points of error. It first contends that the lease imposed upon Cities the affirmative duty to repair. In the alternative, it asserts that the provision is ambiguous and thus evidence of the parties' intent should have been received, and further that, in any event, Cities assumed the duty to repair and the question of its liability for dilatory or negligent performance of that duty should

have been submitted to the jury for determination.

We have concluded that the trial court's action in rendering a take nothing judgment was proper.

That portion of paragraph 12 of the lease relating to repairs necessary for initial licensing says nothing about Cities having any duty to make repairs; only that it would bear the expense of necessary repairs. A covenant to pay for repairs is distinct from the covenant to make repairs, and such an agreement does not impose upon the landlord any active duty to repair. See 51C C.J.S. Landlord & Tenant § 368(1)b, p. 943, and authorities cited.

Neither is the provision ambiguous. Ambiguity is a question of law for determination by the court. If a written instrument is so worded that a court may properly give it a certain legal meaning or interpretation, it is not ambiguous. It is only when the wording is reasonably susceptible to more than one meaning that it is ambiguous, and extraneous evidence of the parties' intent may be received. *R & P Enterprises v. La Guarta, Gavrel & Kirk,* 596 S.W.2d 517 (Tex.1980). A provision that one party shall bear the expense of repair is not ambiguous, and the fact that it fails to state which party shall have the affirmative duty to make those repairs does not render it ambiguous. If a contract does not even purport to deal with a particular subject, its failure to express the parties' intention on that subject does not permit extrinsic proof of such intention on the theory that the writing is ambiguous, since the rule permitting oral testimony to explain an ambiguous writing has application only when the intention is expressed, but is expressed in uncertain language susceptible of more than one interpretation. *Wahlenmaier v. American Quasar Petroleum Company,* 517 S.W.2d 390 (Tex.Civ.App.—El Paso 1974, writ ref'd n.r.e.); *Don Drum Real Estate Company v. Hudson,* 465 S.W.2d 409 (Tex.Civ.App.—Dallas 1971, no writ); *Bauer v. Taylor,* 118 S.W.2d 826 (Tex.Civ.App.—Eastland 1938, writ ref'd); 2 Ray, Texas Evidence § 1685, p. 418.

Moreover, National made no attempt at the trial to produce evidence of the parties' intention. Even though the trial court had ruled *in limine* that no such evidence would be admitted, it was National's duty to reurge and offer its proof at the trial and produce its evidence on a bill of exceptions if it contended that an ambiguity authorized the reception of the evidence. *Roberts v. Tatum*, 575 S.W.2d 138 (Tex.Civ.App.—Corpus Christi 1978, writ ref'd n.r.e.); *City of Corpus Christi v. Nemec*, 404 S.W.2d 834 (Tex.Civ.App.—Corpus Christi 1966, no writ).

██ National contends that because Cities ultimately voluntarily undertook to make the repairs, it is now estopped from claiming that it had no such duty, and should be liable for its delay and its alleged malfeasance in making those repairs. We reject this proposition for two reasons. First, the fact that a landlord voluntarily or gratuitously makes repairs neither constitutes an admission or evidence of a duty to make such repairs, nor does it operate to create a new or collateral agreement to do so. *Yarbrough v. Booher*, 141 Tex. 420, 174 S.W.2d 47 (1943); *Morton v. Burton-Lingo Co.*, 136 Tex. 263, 150 S.W.2d 239 (1941); *Kallison v. Ellison*, 430 S.W.2d 839 (Tex.Civ.App.—San Antonio 1968, no writ); 35 Tex. Jur.2d Landlord and Tenant § 85, p. 576; 51C C.J.S. Landlord & Tenant § 366(1), p. 928. And estoppel avails National nothing in the circumstances present here, since there is no allegation or evidence that it relied to its detriment upon Cities' voluntary making of the repairs. Second, even if it be conceded that one who voluntarily assumes to make repairs thereby becomes obligated to complete them in a reasonable time, there is no evidence in this record by which it could be ascertained that National was damaged, because there is no evidence as to what would constitute a reasonable time for the making of the repairs and whether or not once Cities voluntarily undertook to make them, it failed to do so with reasonable dispatch under all the circumstances.

For the reasons stated, the judgment of the trial court is affirmed.