**LAKE CHARLES HARBOR AND TERMINAL DISTRICT and Lake Charles Stevedores, Inc., Appellants,**

v.

**BOARD OF TRUSTEES OF THE GALVESTON WHARVES,**
Appellee.

No. 14–00–00746–CV.

Court of Appeals of Texas,
Houston (14th Dist.).

Oct. 18, 2001.

---

Charles W. Peckham, Houston, for appellants.

Anthony P. Brown, Kenneth J. Bower, Galveston, for appellees.

Panel consists of ANDERSON, HUDSON, and FROST, JJ.

## OPINION

J. HARVEY HUDSON, Justice.

This appeal arises from a dispute between the purchaser of two cranes and the port at which the cranes were located over liability for damage caused by rodent infestation. In the trial court, appellants Lake Charles Harbor and Terminal District ("LCHTD") and Lake Charles Stevedores, Inc. ("LCS") (collectively, "Lake Charles"), complained that appellee Board of Trustees of the Galveston Wharves (the "Wharves") breached its duty to prevent vermin from despoiling the cranes. In eight points of error, appellants contend the trial court erred in granting appellees' motion for summary judgment and denying appellants' counter-motion for partial summary judgment. We affirm.

### Factual and Procedural Background

In 1993, the Wharves leased property to ABT Galveston Limited Partnership ("ABT"). ABT, in turn, constructed on the property an automated facility for loading and unloading unitized cargo from ocean going vessels. Part of the automated equipment included two Bailey Dockside Unitizer Shiploader Gantry Cranes.

In August 1996, ABT failed when one of its creditors, CIT Group/Equipment Financing, Inc. ("CIT"), foreclosed. During negotiations for the purchase of the cranes from CIT, LCHTD and the Wharves entered into an "Access Agreement" on March 12, 1997, whereby LCHTD was permitted to store the cranes on the property and prepare them for eventual shipment to Louisiana. Thereafter, on March 27, 1997, LCHTD purchased the cranes and appurtenant equipment from CIT for approximately $14,000,000. LCHTD then entered into a separate agreement with LCS whereby the latter agreed, at its own cost, to dismantle the cranes and transport them to their new location. The Wharves terminated its lease with the now defunct ABT on March 31, 1997. In mid-June 1997, LCHTD became aware that the gnawing of rodents had caused substantial damage to the electrical wiring systems of the cranes.[1] On August 26, 1997, LCHTD presented a claim to the Wharves for the cost of repairs. This claim was refused, and the instant litigation ensued.

Lake Charles sought recovery under statutory warehouse bailment provisions providing for liability where damage results from the location of the storage of the goods or from the failure to use reasonable care in their handling.[2] In addi-

---

1. Norway rats (*rattus norvegicus*) and roof rats (*rattus rattus*) were identified by an entomologist as having been the culprits. *See*

*generally Mammals of Texas—Online Edition, at* http://www.nsrl.ttu.edu/tmot1/index.htm.

2. Lake Charles first argued that the March 12, 1997, Access Agreement constituted a ware-

tion, Lake Charles asserted claims for damages for negligence, breach of contract, breach of implied warranty and under common law bailment theory (1) for breach of agreement to maintain the cranes in the same condition they were in when the bailment commenced and (2) for breach of a duty of ordinary care in the storage of the cranes. Damages were requested in the amount of $365,000, exclusive of interest and attorney fees, for the cost of repairing the cranes. Alternatively, Lake Charles sought indemnification under the terms of the Access Agreement.

The Wharves filed a combined traditional and "no evidence" motion for summary judgment. Lake Charles responded with a counter-motion for partial summary judgment. The trial court rendered a take-nothing summary judgment for the Wharves without specifying the grounds therefor.

## Standards of Review

■ A traditional motion for summary judgment is properly granted only when the movant establishes that there are no genuine issues of material fact to be decided and that he is entitled to judgment as a matter of law. *See* Tex.R. Civ. P. 166a(c); *Lear Siegler, Inc. v. Perez*, 819 S.W.2d 470, 471 (Tex.1991); *Holmstrom v. Lee*, 26 S.W.3d 526, 530 (Tex.App.—Austin 2000, no pet.). A defendant seeking summary judgment must negate as a matter of law at least one element of each of the plaintiff's theories of recovery or plead and prove as a matter of law each element of an affirmative defense. *See Centeq Real-*

ty, Inc. v. Siegler, 899 S.W.2d 195, 197 (Tex.1995). If the defendant establishes a right to summary judgment, the burden shifts to the plaintiff to present evidence raising a fact issue. *See id.*

■ A party may also move for a "no-evidence" summary judgment. *See* Tex.R. Civ. P. 166a(i). Such a motion asserts there is no evidence of one or more essential elements of claims upon which the opposing party would have the burden of proof at trial. *See id.; McCombs v. Children's Med. Ctr.*, 1 S.W.3d 256, 258 (Tex. App.—Texarkana 1999, no pet.). Unlike a movant for traditional summary judgment, a movant for a no-evidence summary judgment does not bear the burden of establishing a right to judgment by proving each claim or defense. *See Holmstrom*, 26 S.W.3d at 530. A no-evidence summary judgment is essentially a pretrial directed verdict, to which we apply the same legal sufficiency standard of review. *See id.; Moore v. K Mart Corp.*, 981 S.W.2d 266, 269 (Tex.App.—San Antonio 1998, pet. denied). A no-evidence summary judgment is properly granted if the non-movant fails to produce more than a scintilla of probative evidence raising a genuine issue of fact as to an essential element of a claim on which the non-movant would have the burden of proof at trial. *See* Tex.R. Civ. P. 166a(i); *Holmstrom*, 26 S.W.3d at 530.

■ In reviewing the grant of summary judgment, we view the evidence in the light most favorable to the non-movant and make every reasonable inference and resolve all doubts in favor of the non-

house receipt, and thus the Wharves should be held strictly liable for damage to the cranes under a provision of the Texas Business and Commerce Code that holds a warehouseman liable for damages where "the location of the warehouse where the goods are stored" is left off the receipt. Tex. Bus. & Com.Code § 7.202(b)(1). In the alternative,

Lake Charles asserted a breach of a statutory provision that holds "[a] warehouseman ... liable for damages for loss or injury to the goods caused by his failure to exercise such care in regard to them as a reasonably careful man would exercise under like circumstances." *Id.* § 7.204(a).

movant. *See Centeq Realty,* 899 S.W.2d at 197; *Robins v. Kroger Co.,* 982 S.W.2d 156, 159 (Tex.App.—Houston [1st Dist.] 1998, pet. denied). When the trial court grants one party's motion for summary judgment and denies the other, we review both motions and if we find the trial court erred, we will reverse and render the judgment the trial court should have rendered. *See Bradley v. State ex rel. White,* 990 S.W.2d 245, 247 (Tex.1999); *Holmstrom,* 26 S.W.3d at 530.

## Breach of Contract

In the first point of error, Lake Charles alleges the trial court erred both in granting summary judgment for the Wharves on the breach of contract claims and in denying Lake Charles' counter motion for summary judgment on the same claims.

■ The only agreement between the Wharves and either LCHTD or LCS was the Access Agreement of March 12, 1997, by which CIT, LCHTD and the Wharves agreed that LCHTD would have access to the property formerly under lease by ABT so it could arrange for the cranes to be dismantled and removed. Section 1 of the agreement sets out its essence:

> In reliance on the representations, warranties and covenants contained herein and subject to the terms and conditions hereof during the period from the Date of Foreclosure to and including the Final Removal Date [the Wharves] will provide to [LCHTD] access to the property specified on Schedule B to this Access Agreement ("Premises") and hereby authorizes [LCHTD] to take any and all actions required for [LCHTD] to remove the Assets from the Premises. [LCHTD] agrees that the removal of the Assets from the Premises will be conducted in a reasonable and non destructive (other than actions required to remove the Assets) manner and in a

manner which does not unduly interfere with the activities of [the Wharves].

Lake Charles contends the Wharves had responsibility for vermin control based on two clauses in the Access Agreement. The first is Section 4, which provides that:

> [i]n removing the Assets from the Premises, [LCHTD] agrees to comply with all of the safety procedures set forth on Schedule D to this Access Agreement.

Schedule D is a document entitled "Galveston Wharves Safety Management Policy and Procedure: Contractor, Tenant, User (February 1997)." The "Housekeeping" section of this document states, in pertinent part, that all employees, contractors, tenants, users, and guests of the Galveston Wharves should:

> [k]eep all work sites clean to the extent that the nature of the work allows. This applies to equipment, power cords, air lines, waste disposal, and vermin control.

There is no other reference to Schedule D in the agreement. The second clause relied upon by Lake Charles, Section 15 of the Access Agreement, provides that:

> [e]xcept for the fees specified in this Agreement which are to be paid by [CIT] or [LCHTD], all other costs, expenses and fees that may be payable with regard to the ownership or operation of the Premises will be paid by [the Wharves]. Each party will be liable for its own costs and expenses incurred in connection with the negotiation, preparation, execution or performance of the Access Agreement.

Based on these provisions, therefore, Lake Charles contends the Wharves had a contractual responsibility to keep the property free of vermin and failed in this duty. We disagree.

■ The primary concern of a court in construing a written contract is to ascertain the true intent of the parties as ex-

pressed in the instrument. *National Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex.1995). If a written contract is so worded that it can be given a definite or certain legal meaning, then it is not ambiguous. *Id.; Coker v. Coker*, 650 S.W.2d 391, 393 (Tex.1983). Parol evidence is not admissible for the purpose of creating an ambiguity. *See National Union Fire Ins. Co.*, 907 S.W.2d at 520; *Universal C.I.T. Credit Corp. v. Daniel*, 150 Tex. 513, 243 S.W.2d 154, 157 (Tex.1951).

If, however, the language of a contract is subject to two or more reasonable interpretations, it is said to be ambiguous. *National Union Fire Ins. Co.*, 907 S.W.2d at 520; *see also Glover v. National Ins. Underwriters*, 545 S.W.2d 755, 761 (Tex.1977). Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present at the time the contract was executed. *National Union Fire Ins. Co.*, 907 S.W.2d at 520; *see also Coker*, 650 S.W.2d at 394. Only where a contract is first determined to be ambiguous may the courts consider the parties' interpretation and admit extraneous evidence to determine the true meaning of the instrument. *National Union Fire Ins. Co.*, 907 S.W.2d at 520.

An ambiguity does not arise simply because the parties advance conflicting interpretations of the contract. *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 134 (Tex.1994); *Sun Oil Co. (Delaware) v. Madeley*, 626 S.W.2d 726, 727 (Tex.1981). For an ambiguity to exist, both interpretations must be reasonable. *National Union Fire Ins. Co.*, 907 S.W.2d at 520; *see also Glover*, 545 S.W.2d at 761. Thus, the appellate court must decide whether there is more than one reasonable interpretation of the contract such that a fact issue was created concerning the parties' intent. *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996).

As appellants acknowledge, no ambiguity exists in the Access Agreement. Section 4 of the agreement, incorporating Schedule D, unambiguously places responsibility for keeping the property clean and free of vermin during removal of the cranes upon LCHTD, not the Wharves. Appellants nonetheless contend that, as LCHTD expressly assumed rodent control responsibility only when actually removing the cranes, at all other times it remained with the Wharves under the terms of the safety manual incorporated as Schedule D. In effect, appellants allege the Wharves owed contractual pest control duties to LCHTD under Section 4 of the Access Agreement and Schedule D until LCHTD actually began the process of removing the cranes. As detailed above, however, the language of Section 4 will not permit such a construction. The provision applies only to LCHTD, and only then during the removal of the cranes. To interpret it as creating a contractual duty on the part of the Wharves to protect the cranes from rodents at all other times "is fundamentally at odds with both the plain meaning and rationale of the . . . provision, it is not only not a reasonable interpretation of it, but is instead an obliteration of it which produces precisely the opposite of the intended effect." *Betco Scaffolds Co. v. Houston United Cas. Ins. Co.*, 29 S.W.3d 341, 347 (Tex.App.—Houston [14th Dist.] 2000, no pet.). We are bound to enforce Section 4 as it is written, not to nullify it. *See id.* (citing *Royal Indem. Co. v. Marshall*, 388 S.W.2d 176, 181 (Tex.1965), for the proposition that "[c]ourts cannot make new contracts between the parties, but must enforce the contracts as written.").

The second clause relied upon by Lake Charles proves similarly unavailing. Section 15 of the agreement requires only that

the Wharves pay certain costs and expenses with regard to their ownership and operation of the premises. It plainly does not, however, compel the Wharves to undertake those activities for which such costs and expenses may be incurred. *See National Living Centers v. Cities Realty Corp.*, 619 S.W.2d 422, 424 (Tex.App.—Texarkana 1981, no writ) (finding that "[a] covenant to pay for repairs is distinct from the covenant to make repairs, and such an agreement does not impose upon the landlord any active duty to repair"). Even were we to assume, therefore, that vermin control was a covered cost or expense, the terms of the Access Agreement do not oblige the Wharves to provide such extermination.

Because Lake Charles' interpretations of sections 4 and 15 of the Access Agreement are not reasonable interpretations, their first point of error fails to demonstrate that the trial court erred in granting summary judgment for the Wharves on the contractual claims and in denying Lake Charles' counter motion for summary

judgment on the same claims and is overruled.

### "Exclusive Remedies" Provision

■ In sections 7, 8, and 9 of the Access Agreement, the parties set forth the various representations and warranties of the seller (CIT), the buyer (LCHTD), and the owner (the Wharves). The only representations and warranties made by the Wharves were that (1) it was an agency of the City of Galveston, (2) it had the full power and authority to enter into the Access Agreement, and (3) that the execution, delivery and performance of the Access Agreement neither violated any statute, ordinance, obligation, writ, injunction, rule or regulation nor required the consent of a third party.[3] Section 14 of the agreement then states:

> To the extent permitted by law and subject to the limitations on liability set forth below, [the Wharves] agrees to fully indemnify and hold harmless [CIT] and [LCHTD], their respective members, principals, officers, directors, em-

---

**3.** In full, the Wharves represented and warranted to CIT and LCHTD as follows:

(a) *Owner's Organization and Good Standing.* Owner is a separate utility and agency of the City of Galveston duly organized and validly existing under the laws of the State of Texas.

(b) *Authority; Execution and Delivery.* Owner has the full power and authority to enter into this Access Agreement. The execution, delivery and performance of this Access Agreement and the other agreements contemplated hereby by Owner, have been duly authorized by Owner. This Access Agreement and the other agreements contemplated hereby have been duly executed and delivered by Owner and constitute the legal, valid and binding obligations of Owner enforceable against Owner in accordance with their respective terms.

(c) *Consents, No Conflicts, Etc.* None of the execution, delivery and performance of this Access Agreement, the other agreements contemplated hereby, the consummation of

the transactions contemplated herein or therein or compliance by Owner with any of the provisions hereof or thereof will (with or without the giving of notice of the passage of time) (i) violate or conflict with any provision of the enabling act and city charter provisions under which Owner is organized, (ii) violate or conflict with any provision of any note, bond, mortgage, indenture, deed of trust, or any material license, agreement, or any other instrument or obligation to which Owner is a party, or by which Owner or any of Owner's assets or properties may be bound or affected, (iii) violate any order, writ, injunction, decree, statute, rule or regulation applicable to Owner or any of its assets or properties, or (iv) require the consent, approval, permission or other authorization of any court, arbitrator or governmental, administrative, or self-regulatory authority or any other third party other than the approval of the Board of Trustees (which has been obtained).

ployees and Affiliates against and in respect of any and all liabilities, losses, damages, deficiencies, costs, or expenses (including, without limitation, the reasonable fees and expenses of investigation and counsel) (collectively, "Losses") resulting from (A) any misrepresentation or breach of representation, warranty, covenant, or agreement by [the Wharves] made in this Agreement, and (B) any and all actions, suits, proceedings, claims, demands, assessments, judgements incidental to the foregoing or the enforcement of such indemnification.

In their second point error, Lake Charles contends this provision compels the Wharves to pay for any losses sustained by LCHTD at Galveston Wharves. We disagree. The indemnification provision is very narrow and states only that the Wharves will indemnify LCHTD for damages resulting from *any misrepresentation or breach of warranty;* it does not constitute an all-encompassing guarantee that the Wharves would be responsible for every loss sustained by LCHTD.

### Express Negligence Doctrine

In addition to the foregoing "exclusive remedies" argument, appellants contend in their second point of error that the Wharves could not relieve itself of liability for its own negligence without an express provision in the Access Agreement. Lake Charles cites the "express negligence doctrine" as authority for this argument. The express negligence doctrine, however, has nothing to do with the issue before us; the doctrine provides that parties seeking to indemnify the indemnitee from the consequences of its own negligence must express that intent in specific terms within the four corners of the contract. *Polley v. Odom,* 957 S.W.2d 932, 935 (Tex.App.—Waco 1997, no pet.).

Thus, if LCHTD were seeking indemnification for damages arising from its own negligence, the indemnification agreement would have to expressly state in writing that it was the intent of the parties that the Wharves would indemnify LCHTD for damages arising from its own negligence. Here, however, LCHTD seeks reimbursement for the alleged negligence of the Wharves, not its own. The express negligence doctrine has no application to this claim.

### Negligence

Throughout their second and third points of error, appellants further contend that the Wharves cannot lawfully be relieved of responsibility for its own negligence. However, to sustain a cause of action for negligence, a plaintiff must produce evidence of a duty, a breach of that duty, proximate cause, and damage. *Colvin v. Red Steel Co.,* 682 S.W.2d 243, 245 (Tex.1984); *Parker v. Miller,* 860 S.W.2d 452, 454 (Tex.App.—Houston [1st Dist.] 1993, n.w.h.). The threshold inquiry in a negligence case is duty. *Greater Houston Transp. Co. v. Phillips,* 801 S.W.2d 523, 525 (Tex.1990). If no legal duty exists, no legal liability can arise on account of negligence. *Hanselka v. Lummus Crest, Inc.,* 800 S.W.2d 665, 667 (Tex. App.—Corpus Christi 1990, no writ). The existence of a duty is a question of law for the court. *Phillips,* 801 S.W.2d at 525. Here, the only duty the Wharves could have had to Lake Charles to exterminate vermin would have been a contractual duty. The Access Agreement, however, places no such obligation on the Wharves. Moreover, appellants' negligence claim is barred by the doctrine of sovereign immunity as discussed below.

### Sovereign Immunity

The doctrine of sovereign immunity, unless waived, protects the State

of Texas, its agencies and its officials from lawsuits for damages, absent legislative consent to sue the State. *Federal Sign v. Texas Southern University*, 951 S.W.2d 401, 405 (Tex.1997). Municipalities, such as the City of Galveston, are creatures of our law and are created as political subdivisions of the state as a convenient agency for the exercise of such powers as are conferred upon them by the state. *City of Lancaster v. Chambers*, 883 S.W.2d 650, 658 (Tex.1994) ("A municipality, as a political subdivision of the state, is not liable for the acts or conduct of its officers or employees unless the municipality's common law immunity is waived by the Texas Tort Claims Act"); *see also Payne v. Massey*, 145 Tex. 237, 196 S.W.2d 493, 495 (1946); *City of Amarillo v. Pruett*, 44 S.W.3d 702, 707 (Tex.App.—Amarillo 2001, no pet.). They "represent no sovereignty distinct from the state and possess only such powers and privileges as have been expressly or impliedly conferred upon them." *Payne*, 196 S.W.2d at 495.

■ The State has accorded certain municipalities that own or operate a port the power to "construct, acquire, lease, improve, enlarge, extend, repair, maintain, replace, develop, or operate a port improvement or facility." TEX. TRANSP. CODE § 54.003(a).[4] Moreover, this power is "a public and governmental function, is exercised for a public purpose, ... is a matter of public necessity," and may be vested in a governing board. *Id.* §§ 54.003(c), 54.051(a). The City of Galveston has placed its wharf and terminal facilities under the management and control of the Board of Trustees of the Galveston Wharves. GALVESTON, TEX., CHARTER, art. XII, §§ 1–2 (designating Galveston Wharves as a "separate utility" of the City of Galveston to be managed by the Board of Trustees of the Galveston Wharves); *see also City of Galveston v. Hill*, 519 S.W.2d 103, 105 (Tex.1975) (noting that the Board of Trustees of the Galveston Wharves have been explicitly vested with governmental functions). The Wharves is thus a governmental unit, and as such is protected by the doctrine of sovereign immunity.

■ In their third point of error, however, appellants contend the Wharves waived immunity by promulgating "Tariff Circular No. 5," a document detailing rules and regulations governing dockage, shed hire, and other services and charges applying at the facilities of the Galveston Wharves. Two provisions of the Tariff are cited by Lake Charles to buttress this argument. The first, concerning indemnity obligations, provides:

> Except as may be caused by Galveston Wharves' own negligence, vessels, their owners or agents, and all other users of the facilities of the Board of Trustees of the Galveston Wharves agree to indemnify and save harmless the Board of Trustees of the Galveston Wharves from and against all losses, claims, demands and suits for damages, including death and person-

---

4. The legislature has determined this power be available only to a municipality that:
(1) is located on:
  (A) the Gulf of Mexico; or
  (B) a channel, canal, bay, or inlet connected to that gulf; and
(2) has a population of more than 5,000.
TEX. TRANSP. CODE § 54.001. As the City of Galveston is located on the Gulf of Mexico and, according to most recent data available from the United States Census Bureau, has a population of 57,247, it is undoubtedly a qualifying municipality for purposes of this section of the Texas Transportation Code. *See* TIMES ATLAS OF THE WORLD: COMPREHENSIVE EDITION PLATE 112 (John C. Bartholomew et al. eds, 1983); *Profile of General Demographic Characteristics: 2000 (Galveston city, Texas)*, *at* http://www.census.gov.

al injury, incident to or resulting from their operations on the property of the Board of Trustees of the Galveston Wharves and use of its facilities. Lake Charles contends this provision constitutes an acknowledgment by the Wharves that it may be held liable for its own negligence. The second provision, entitled "Liability for Loss or Damage to Freight or Cargo," states:

> Except as may be caused by its own negligence, Galveston Wharves shall not be liable for any damage to or loss of any freight or cargo being loaded or unloaded at the facility; nor for damage to or loss of freight or cargo on or in its facilities from any cause whatsoever, including but not limited to: ... rats, mice, moths, weevils or other animals or insects....

Again, Lake Charles cites this section as an admission that the Wharves is liable for any damage negligently caused by it, including damage caused by rodents.

Absent the use of clear and unambiguous language, there can be no waiver of sovereign immunity. *Federal Sign*, 951 S.W.2d at 417. Thus, we do not interpret either of the aforementioned provisions as waivers of immunity. These provisions provide for no liability when Galveston Wharves is not negligent, but they cannot be construed as express waivers of sovereign immunity for claims stemming from its own negligence. Moreover, Lake Charles cannot show any negligence because, as previously detailed, the Wharves had no duty to protect the premises from vermin.

In addition, appellants contend the doctrine of sovereign immunity is preempted by federal maritime law with regard to port facilities. This assertion, however, has been expressly rejected by the Texas Supreme Court. *State Dept. of Highways v. Dopyera*, 834 S.W.2d 50, 52–53 (Tex. 1992) (holding that, "under applicable federal construction rules, Texas has not waived its sovereign immunity to general maritime jurisdiction, and the State's limited waiver of sovereign immunity, under state rules of construction, insulates it from liability" unless waived).

Because, as a matter of law, the Wharves did not breach the terms of the Access Agreement, had no duty to control vermin, and was protected from liability under the doctrine of sovereign immunity, we do not need to address Lake Charles' remaining claims. The judgment of the trial court is affirmed.