COURT OF APPEALS









COURT OF APPEALS

EIGHTH DISTRICT OF TEXAS

EL PASO, TEXAS

 


 
 
  
 RICHARD T. KELLY,
  
                             Appellant,
  
 v.
  
 RIO GRANDE COMPUTERLAND
 GROUP, ELIO CASTANUELA, AND MANUEL MARRUFO,
  
                             Appellees.
 
 
  
 '
    
 '
    
 '
    
 '
    
 '
    
  ' 
  
 
 
  
  
                 No. 08-02-00304-CV
  
 Appeal from the
  
 41st District Court
  
 of El Paso County, Texas 
  
 (TC#94‑13605) 
  
 
 


 

O P I N I O N

 








Richard T. Kelly appeals summary
judgment in favor of defendants Rio Grande Computerland
Group (RGCG) , Elio Castanuela, and Manuel Marrufo.  Kelly=s petition to the trial court claimed
that RGCG, Castanuela, and Marrufo
are liable for breach of contract, promissory estoppel,
equitable estoppel, common law fraud, and statutory
fraud.  He seeks reinstatement as
president and director of the corporation, as well as actual and exemplary
damages, attorney=s fees, and access to the books and records of RGCG.  He also seeks declaratory judgment that he
was denied his proper station as president and director of RGCG.  The trial court entered two orders of summary
judgment in favor of all defendants and denied summary judgment to the
plaintiff.  We affirm in part and reverse
in part.

Facts

In early October 1993, Richard Kelly,
Judd Singer, and Sam Davis were the sole shareholders in Rio Grande Computerland Group. 
Kelly held the majority of shares. 
Kelly was the president of the corporation from 1980 through 1994.  In 1994, the shareholders listed RGCG for
sale with a business broker, priced at $800,000.  Singer explained the first contacts with Castanuela and Marrufo in his
deposition:

They approached
us at first with a discussion of purchasing the company.  It later evolved . . . into a discussion of
taking a piece of the--a business, investing in the business, if you will,
helping us to grow the business to the next level, which was what our goals
were and reasoning behind bringing in additional investors.  

 

On September 24, 1993, Castanuela
and Marrufo sent a letter of intent offering to
purchase a 60 percent share of the company.

The document was entitled ALetter of Intent to Acquire Shares of
Rio Grande Computerland Group, Inc.@ 
It began ADear Rick,@ and was signed by Castanuela and Marrufo.  Its stated
purpose was to outline the terms and conditions of the agreement with respect
to the purchase by Elio Castanuela
(ACastanuela@) and Manuel Marrufo
(AMarrufo@) of sixty percent (60%) of the
authorized, issued and outstanding shares of the voting shares of Rio Grande Computerland Group, Inc. (ARGCG@). 
Among its provisions were:








1.         Purchase
of Stock. RGCG will issue to Castanuela and Marrufo, in equal shares, that number of shares that is
necessary so that following such issuance of shares Castanuela
and Marrufo will own sixty percent (60%) of the
authorized, issued and outstanding voting shares of all classes of RGCG.  The total consideration to be paid by Castanuela and Marrufo for such
shares shall be Three Hundred Thousand Dollars ($300,000) which will be payable
immediately upon issuance of the shares.

 

 2.        Election of Directors and Officers.  Following the issuance of such shares, Castanuela, Marrufo and Rick
Kelly (AKelly@) will enter into a shareholders agreement whereby
they each agree to vote their respective shares to elect Castanuela
as a member of the board of directors and chairman of the board of directors
and to elect Marrufo and Kelly as members of the
board of directors.  Further, Castanuela, Marrufo and Kelly
shall agree to elect Kelly as president of the corporation, Marrufo
as executive vice-president and chief financial officer, and to elect Castanuela as senior vice-president of sales.

 

3.         Responsibilities.  Kelly will continue as president of RGCG and
will carry out the duties associated with that office.  Judd Singer (ASinger@) will be continued as vice-president of the service
sales with responsibility to increase the service revenue by several orders of
magnitude over current levels. . . . 
Employment agreements will  be
prepared and entered into by and between RGCG and each of Kelly, Singer, Marrufo, and Castanuela,
providing for officer compensation commensurate with the corporation=s operating budget, duties and responsibilities,
employee benefits, and such other reasonable provisions regarding employment
contracts, to which the parties mutually agree.

 

.    .    .

 

6.         Inter-Company
Receivables. The existing inter-company receivables now on the books of
RGCG which involve amounts due from Computerland/Juarez,
Kelly, and any other receivables from officers or directors of RGCG, will be
written off and charged against retained earnings after giving due regard to
the tax effect to each of the parties as a result of such write off.

 








7.         Operating
Budget.  Kelly, Castanuela
and Marrufo will agree on an operating budget as soon
as practicable following the issuance of the new shares.

 

.    .    .

 

11.       Buy-Sell
Agreement.  As soon as possible,
Kelly, Castanuela and Marrufo
and Singer will enter into a Shareholder Buy-Sell Agreement.

 

12.       Conditions
Precedent to Purchase.   . . . Mrs.
Erin E. Kelly must give spousal consent to the satisfaction of Castanuela and Marrufo, or a
Decree of Final Divorce dissolving the marriage of Kelly and Mrs. Erin E. Kelly
must have been entered by a court of competent jurisdiction whereby Mrs. Erin
E. Kelly has no right, title or interest in the transactions contemplated by
this agreement.  

 

The letter was explicitly made subject to Aapproval of counsel for all parties
and to the preparation and execution of a final binding agreement prepared by
counsel for all parties.@   Kelly, majority
shareholder and president of RGCG, together with shareholder Judd Singer,
signed the document as AAgreed and Accepted.@ 
At the time, Kelly and Singer had been meeting with other potential
buyers and specifically wanted a letter of intent, which they felt was a legal
document that would allow us to go forward with negotiations.








Many provisions contained in the
Letter of Intent were ignored in the Purchase Agreement of October 25,
1993.  Those omitted included the
shareholders= agreement, the buy-sell agreement,
and the employment agreement.  Marrufo testified that the purchase agreement, the
shareholders= agreement, and the buy-sell
agreement were to be executed separately; they never were.  Kelly likewise understood that the Purchase
Agreement encompassed only the stock transfer aspects of their agreement, and
that usually employment contracts and buy-sell agreements would not be included
in a Purchase Agreement.  Castanuela contended the Purchase Agreement covers whatever
he agreed to when he purchased the shares of RGCG.  The purchase agreement contained a merger
clause:

Entire Agreement.  This Agreement merges all previous
negotiations between the 
parties hereto and constitutes the entire agreement and
understanding between the parties with respect to the subject matter of this
Agreement.  No alterations, modifications
or change of this Agreement shall be valid except by a like instrument in
writing and signed by each party to this Agreement.

 

According to Kelly, at some point
prior to executing the Purchase Agreement the parties orally agreed that he was
to be paid $6,700 a month, with a salary of $80,000 a year and a draw against
profits of $1,300 a month.  Kelly claims
this arrangement was to last at least one year. 
At the time that Kelly was fired, that is what he was being paid.  On a business trip to Juarez, Mexico, after
the signing of the Purchase Agreement, Kelly and Castanuela
also discussed the execution of the employment agreement and the buy-sell
agreement.  On November 16, after the
execution of the purchase agreement, an agenda for a management meeting notated
that Marrufo was to work on buy-sell agreements and
the employment agreement.  When asked
when he decided not to have employment agreements, Marrufo
replied, AWell, it just didn=t happen.  Nobody . . . asked for one, and nobody got
one.@








Marrufo could not recall any discussion
between signing the Letter of Intent and the Purchase Agreement in which he and
Kelly agreed that there would be no employment agreement, buy-sell agreement,
or shareholder agreement.  Moreover, Marrufo contended that the inter-company receivables
provisions of the Letter of Intent was not meant to be a forgiveness of the
debts, just a write-off for accounting purposes because collectibility
was questionable.  He explained that
actual forgiveness of the debt would require them to give Kelly a 1099 form for
his taxes.  That was not done.

The closing documents and minutes of
the meeting in which Marrufo became a director are
missing.  Kelly was fired as president of
RGCG and removed from the board of directors on February 21, 1994.  Castanuela has been
executive vice-president and chairman of the board of directors of RGCG since
October of 1993.  Marrufo
has been director, shareholder, and president of RGCG since October of 1993.

Kelly=s global issue challenging summary
judgment

Kelly=s sole issue contends the trial court
erred in granting summary judgment because genuine issues of material fact
exist.

Standard of Review








In reviewing the trial court=s grant of summary judgment, we give
no deference to the trial court=s decision.  Summary
judgment is proper only when there is no genuine issue of material fact and movant is entitled to judgment as a matter of law.  Shah v. Moss, 67
S.W.3d 836, 842 (Tex. 2001); Nixon v. Mr. Property Management Co., 690
S.W.2d 546, 548-49 (Tex. 1985); Wyatt v. Furr=s Supermarkets, Inc., 908 S.W.2d
266, 268 (Tex. App.--El Paso 1995, writ denied); Tex. R. Civ. P. 166a(c).  In
determining whether a disputed material fact issue exists, we take as true
evidence favorable to the nonmovant, and every
reasonable inference must be indulged in favor of the nonmovant.  Shah, 67 S.W.3d at 842 (citing American
Tobacco Co., Inc. v. Grinnell, 951 S.W.2d 420, 425 (Tex. 1997)); Wyatt,
908 S.W.2d at 268 (citing Nixon, 690 S.W.2d at 548-49).  If the movant
submits summary judgment conclusively disproving at least one element of the
plaintiff=s case, then summary judgment should
be granted.  Wyatt, 908 S.W.2d at
268 (citing Rayos v. Chrysler Credit Corp.,
683 S.W.2d 546, 547 (Tex. App.--El Paso 1985, no writ)).  Our review of the judgment is limited to the
issues presented to the trial court in the motion for summary judgment.  Sebesta v. Kent Electronics Corp., 886 S.W.2d 459, 460 (Tex.
App.--Houston [1st Dist.] 1994, writ denied) (citing Tex. R. Civ. P. 166a(c); City of Houston v. Clear Creek Basin Auth., 589 S.W.2d
671, 676 (Tex. 1979); Dickey v. Jansen, 731 S.W.2d 581, 583 (Tex.
App.--Houston [1st Dist.] 1987, writ ref=d n.r.e.)).  A summary judgment is not entitled to the
same deference given a judgment following a trial on the merits.  Id.

The Letter of Intent and Purchase Agreement








Central to the parties= dispute is whether the Letter of
Intent was enforceable after the Purchase Agreement was signed.  Kelly contends the Purchase Agreement
memorializes only the first subject agreed to amongst the parties, and that
numerous other agreements are contained in the Letter of Intent.  Castanuela and Marrufo characterize the Letter of Intent as an agreement
to agree that was not binding after the Purchase Agreement was signed.  Throughout this litigation, Castanuela and Marrufo insist
that A[t]here is only one written contract
between Marrufo and Kelly, Castanuela
and Kelly, and [RGCG] and Kelly; namely, the [Purchase] Agreement.@

The terms in the Letter of Intent
constituted a much better bargain for Kelly than those in the Purchase
Agreement.  The letter offered him a
shareholders= agreement, continued his position as
president of the company and board member, wrote off his debts to the company,
and included a buy-sell agreement.  In
exchange, Kelly agreed to continue as the president, settle his wife=s interests in the company, and most
importantly, he and Singer agreed to consider Castanuela
and Marrufo over competing potential buyers.

i.          legally
binding contract








We begin with the question of whether
the Letter of Intent was a legally binding contract.  Whether an agreement is legally enforceable
is a question of law.  Texaco,
Inc. v. Pennzoil Co., 729 S.W.2d 768, 814 (Tex. App.--Houston [1st Dist.]
1987, writ ref=d n.r.e.), cert. dism=d, 485 U.S. 994, 108 S.Ct. 1305, 99 L.Ed.2d 686 (1988).  To be enforceable, the parties must have
agreed on essential terms.  T.O. Stanley Boot Co. v. Bank of El Paso, 847 S.W.2d 218,
221 (Tex. 1992).  However, parties
may agree on some of the contractual terms, understanding them to be an
agreement, and leave other contract terms to be made later.  Id. 
It is only when an essential term is left open for future negotiation
that there is nothing more than an unenforceable agreement to agree.  Oakrock
Exploration Co. v. Killam, 87 S.W.3d 685, 690
(Tex. App.--San Antonio 2002, pet. denied) (citing T.O. Stanley Boot Co.,
847 S.W.2d at 221).  A party cannot
accept an offer to form a contract unless its terms are reasonably
certain.  Id. (citing Texas Oil
Co. v. Tenneco, Inc., 917 S.W.2d 826, 830 (Tex. App.--Houston [14th Dist.]
1994), rev=d on other grounds sub nom., Morgan Stanley & Co., Inc.
v. Texas Oil Co.,
958 S.W.2d 178 (Tex. 1997)).  Texas
courts favor validating transactions rather than voiding them, but courts may
not create a contract where none exists and they generally may not add, alter,
or eliminate essential terms.  Id.  In construing an agreement, the courts may
consider evidence of circumstances surrounding its execution.  America=s Favorite Chicken Co. v. Samaras, 929 S.W.2d 617, 622 (Tex. App.--San
Antonio 1996, writ denied) (citing Sun Oil Co. (Delaware) v. Madeley, 626 S.W.2d 726, 731 (Tex. 1981)).








Under some circumstances, a binding
contract may be formed if the parties agree on the material terms, even though
they leave open other provisions for later negotiation.  John Wood Group USA, Inc. v. ICO, Inc.,
26 S.W.3d 12, 19 (Tex. App.--Houston [1st Dist.] 2000, pet. denied) (citing Scott
v. Ingle Bros. Pac., Inc., 489 S.W.2d 554, 555 (Tex. 1972)).  Similarly, a letter of intent may be binding
even though it refers to the drafting of a future, more formal agreement.  Id. (citing Foreca,
S.A. v. GRD Dev. Co., Inc., 758 S.W.2d 744, 746 (Tex. 1988)).  As letters of intent may be binding,
authorities are quick to warn parties of the risks involved with their
use.  Id.  A party not wishing to be prematurely bound
by a letter agreement is advised to include a provision clearly stating that
the letter is nonbinding, as such negations of liability have been held to be
effective.  Id. (quoting E. Allan Farnsworth, Farnsworth on Contracts
' 3.8b, at 193 (1990)).  No such provision was included here.

Three elements determine whether a
contract for sale has been formed.  The terms
must include:  (1) the thing sold, which
is the object of the contract; (2) the consideration or price to be paid for
the thing sold; and (3) the consent of the parties to exchange the thing for
the price.  John Wood Group, 26 S.W.3d
at 20 (citing Byrd v. State, 54 Tex. Crim.
170, 114 S.W. 135, 136 (1908)).  Here,
all three elements creating a contract for sale were contained in the Letter of
Intent.








The Letter of Intent set out that
Kelly, Castanuela, and Marrufo
would enter into a shareholders= agreement by which they would each become directors and work
together in certain capacities within the corporations.  Kelly was to maintain his position as
president of the corporation.  The
situation in which Kelly had been president for the prior fourteen years could
provide terms by which that position would be carried out.  The Letter is silent as to the period for
which Kelly was to remain as president of RGCG, (prompting the appellees to rely on the Statute of Frauds), and no period
is required in the establishment of a shareholders= agreement.  That could have been established within a
year.  Likewise, buy-sell agreements and
the promise of employment agreements, the execution of which was relied upon by
Kelly in considering what Castanuela and Marrufo were offering, were presented in the plan.  Kelly accepted that offer and, at the very
least, a fact finder could find he was entitled to a good faith effort at its
implementation.

In sustaining Kelly=s issue on breach of contract, we
rely on the Letter of Intent=s lack of cautionary language limiting enforceability; the
inclusion of numerous terms favorable to Kelly that were not included in the
Purchase Agreement; and the evidence from both sides of the lawsuit that the
employment agreement, buy-sell agreement, shareholder=s agreement and receivables agreement
were not intended to be included in the contract for purchase of stock.  We conclude that a fact question exists as to
whether the Letter of Intent was a contract whose terms beyond the Purchase
Agreement remained enforceable, if not superceded by language in the subsequent
document.

ii.         merger language

Castanuela and Marrufo
rely on merger language of the Purchase Agreement in arguing that the Purchase Agreement  completely
supercedes the Letter of Intent. 
Nevertheless, both Marrufo and Castanuela agreed that when the Letter of Intent was
signed, the employment agreement, the purchase agreement, the buy-sell
agreement, and the shareholders= agreement were all intended to be set out in separate
documents.  No discussions between the
signing of the Letter of Intent and the Purchase Agreement removed these topics
from the mix.  Moreover, we cannot agree
that the merger language in the Purchase Agreement conclusively terminates all
promises set forth in the Letter of Intent. 
Rather, the Purchase Agreement is limited by its own language:








8.10 Entire
Agreement.  This Agreement merges all
previous negotiations between the parties hereto and constitutes the entire
agreement and understanding between the parties with respect to the subject
matter of this Agreement.  No
alterations, modifications or change of this Agreement shall be valid except by
a like instrument in writing and signed by each party to this Agreement.  (Emphasis added).

 

Thus, we must determine the scope of the subject matter of
this Agreement.  In that regard, our
primary concern in construing any written contract is to ascertain the true
intent of the parties as expressed in the instrument.  Nat=l Union Fire Ins. Co. v. CBI Indus.,
Inc., 907 S.W.2d
517, 520 (Tex. 1995) (citing Forbau v.
Aetna Life Ins. Co., 876 S.W.2d 132, 133 (Tex. 1994)); Lake Charles
Harbor & Terminal Dist. v. Bd. of Trs. of the
Galveston Wharves, 62 S.W.3d 237, 242-43 (Tex. App.--Houston [14th Dist.]
2001, pet. denied).  A written contract
is not ambiguous if it is so worded that it can be given a definite or certain
legal meaning.  Nat=l Union Fire Ins. Co., 907 S.W.2d at 520 (citing Coker
v. Coker, 650 S.W.2d 391, 393 (Tex. 1983)). 
Parol evidence is not admissible for the
purpose of creating an ambiguity.  Nat=l Union Fire Ins. Co., 907 S.W.2d at 520; Lake Charles
Harbor & Terminal Dist., 62 S.W.3d at 243.








Where contract language is subject to
two or more reasonable interpretations, however, it is ambiguous.  Nat=l Union Fire Ins. Co., 907 S.W.2d at 520.  Whether a contract is ambiguous is a question
of law for the courts to decide by looking at the contract as a whole in light
of the circumstances present at the time the contract was executed.  Id. 
Only when a contract is first determined to be ambiguous may the courts
consider the parties= interpretation and admit extrinsic evidence to determine the
true meaning of the instrument.  Id.
(citing Sun Oil Co., 626 S.W.2d at 732; R & P Enterprises v. LaGuarta, Gavrel & Kirk, Inc.,
596 S.W.2d 517, 518 (Tex. 1980)).

An ambiguity in a contract may be
either patent or latent.  Id.  Whereas a patent ambiguity is evident on the
face of the contract, a latent ambiguity arises when a contract which is
unambiguous on its face is applied to the subject matter with which it deals
and an ambiguity appears.  Id.  If a latent ambiguity arises, parol evidence is admissible for the purpose of
ascertaining the parties= true intent as expressed in the
agreement.  Id.

Here, Kelly urges the term Athe subject matter of this Agreement@ can reasonably be found to be
referring only to the purchase of stock as set forth in the Purchase Agreement=s paragraph one.  Castanuela and Marrufo, in contrast, claim the phrase refers to all
agreements between the parties.  We
cannot say that either parties= interpretation is beyond reason, and
thus a latent ambiguity has been exposed within the merger clause.  We therefore look at any extrinsic evidence
available to determine the parties= intent.








Before one contract is merged into
another, the last contract must be between the same parties as the
first, must embrace the same subject matter, and must have been so
intended by the parties.  Fish v. Tandy Corp., 948 S.W.2d 886, 898-99 (Tex. App.--Fort
Worth 1997, writ denied).  We note
initially that none of the personal benefits to Kelly listed in the Letter of
Intent were included in the Purchase Agreement. 
The broader range of subjects discussed in the Letter of Intent makes it
reasonable that the Purchase Agreement was only one of a number of contracts to
follow the initial agreement of the parties. 
Castanuela and Marrufo
insist on numerous occasions that they were not officers or shareholders of
RGCG at the time the Letter of Intent was signed.[1]  Although this contention is helpful to the
company, it also supports the contention that they entered it as individuals
and thus were individually responsible for fulfilling its terms.

Thus, we conclude there is a fact
question as to whether the Purchase Agreement was only the first in a series of
agreements to be executed by the parties as memorialized in the Letter of
Intent.  We further conclude that the
documents in this case were not so clearly merged as to warrant a summary
judgment on that ground.  Notably, the
purchase agreement contains all benefits flowing to RGCG, Castanuela,
and Marrufo contained in the Letter of Intent; it
contains none of the benefits that were to flow to Kelly.  For these reasons, summary judgment with
respect to Kelly=s claim for breach of contract against Castanuela,
Marrufo and RGCG was in error, and that portion of
Kelly=s issue on appeal is sustained.

iii.       promissory estoppel








In light of our conclusion that the
Purchase Agreement does not contain conclusive language merging all earlier
agreements, we believe summary judgment based on promissory estoppel
was also improper.  Although normally a
defensive theory, a promisee may have a cause of
action for relying upon an otherwise unenforceable promise.  MCN Energy Enterprises, Inc. v. Omagro de Colombia, L.D.C., 98 S.W.3d 766, 774 (Tex.
App.--Fort Worth 2003, review denied) (citing Wheeler v. White, 398
S.W.2d 93, 96-97 (Tex. 1965)).  The
elements of promissory estoppel are:  (1) a promise, (2) foreseeability
of reliance thereon by the promisor, and (3)
substantial reliance by the promisee to his or her
detriment.  Id. (citing English
v. Fischer, 660 S.W.2d 521, 524 (Tex. 1983)).

Castanuela and Marrufo
offered benefits to Kelly in the Letter of Intent, and he presented evidence
that he relied on these in rejecting other potential purchasers.  Selling controlling interest in the company
to Castanuela and Marrufo
could be found to be foreseeable reliance on the representations made in the
Letter of Intent.  Summary judgment was
not appropriate on promissory estoppel with regard to
the individuals Castanuela and Marrufo.  That portion of Kelly=s issue on appeal is sustained.

iv.        equitable estoppel

Unlike promissory estoppel,
equitable estoppel does not lend itself to an
offensive posture.  Finding no exception
to the use of equitable estoppel as a defensive
theory only, we follow our sister courts in refusing to recognize this as a
distinct cause of action separate from promissory estoppel
or fraud.  See, e.g., Watson v. Nortex Wholesale Nursery, Inc., 830 S.W.2d 747, 751
(Tex. App.--Tyler 1992, writ denied); Crowder v. Tri-C Resources, Inc.,
821 S.W.2d 393, 397 (Tex. App.--Houston [1st Dist.] 1991, no pet.).  Summary judgment as to the cause of action
for equitable estoppel is affirmed.








Fraud

Kelly notes that he is claiming
against the individual defendants, not RGCG, for fraud.  We next turn to these claims against Marrufo and Castanuela.

i.          common law
fraud








In order to establish a prima facie
case for fraud, a plaintiff must establish the following elements:  (1)  a material representation was made;
(2) that was false; (3) when made, the speaker knew it was false or made it
recklessly without any knowledge of the truth and as a positive assertion; (4)
it was made with the intent that the other party should act upon it; (5)
reliance; and (6) injury.  In re FirstMerit Bank, N.A., 52 S.W.3d 749, 758 (Tex. 2001)
(citing Formosa Plastics Corp. v. Presidio Engrs.
& Contractors, Inc., 960 S.W.2d 41, 47 (Tex. 1998)).  A promise to do an act in the future is
actionable misrepresentation if the promise was made with no intention of
performing at the time it was made.  Formosa,
960 S.W.3d at 48. 
Mere failure to perform a contract is not evidence of fraud.  Id.; Crim Truck & Tractor Co. v.
Navistar Int=l
Transp. Corp., 823
S.W.2d 591, 597 (Tex. 1992). 
However, that an agreement was not fulfilled may be considered along
with other facts to establish intent.  Spoljaric
v. Percival Tours, Inc., 708 S.W.2d 432, 435 (Tex. 1986).  Since intent to defraud is not susceptible to
direct proof, it is commonly shown by circumstantial evidence.  Id. 
Slight circumstantial evidence of fraud, when considered with the breach
of promise to perform, is sufficient to support a finding of fraudulent
intent.  Id.  The party=s intent at the time the
representation was made is the legal determinor, and
it may be inferred from subsequent acts. 
Id. at 434.  Intent is a fact question that is uniquely
within the realm of the trier of fact because it so
depends upon the credibility of the witnesses and the weight to be given to
their testimony.  Id.

Castanuela and Marrufo
rely heavily on the fact that their representations to Kelly did not involve
representation of past or then-existing fact; instead they involved promises of
future performance.  From this they
conclude that the false representation basis for fraud does not exist as a
matter of law.  However, as we have just
set out, a promise to act in the future is actionable if made with no intention
of performing at the time the promise is made. 
They do not address this formulation of fraud.

After examining the summary judgment
record, we conclude that Kelly presented evidence that could support a finding of  intent to
defraud.  The Letter of Intent contains a
number of offers by Marrufo and Castanuela,
accepted by Kelly, that were only to occur after the
purchase of shares.  These included the
promises that Kelly would join the board of directors and maintain his position
as president of RGCG.  Kelly was never
made a director and was terminated as president within five months of the
purchase of the company.  No agreement
beyond the purchase of stock was ever honored. 
If a trier of fact concludes this was a
misrepresentation made to entice Kelly with no intention of performance, they
could in turn find fraud.  Summary
judgment on the common law fraud cause of action was error.








Kelly=s issue on appeal challenging summary
judgment on common law fraud against Castanuela and Marrufo is sustained. 
Any fraud claim against the corporation is affirmed.

ii.         statutory fraud

Kelly has also claimed against Castanuela and Marrufo for
statutory fraud under the Texas Business and Commerce Code section 27.01, which
provides:

(a)       Fraud
in a transaction involving real estate or stock in a corporation or joint stock
company consists of a

 

(1)       false representation of a past or existing material fact,
then the false representation is

(A)      made to a person for the purpose of inducing that person to
enter into a contract; and

(B)      relied on by that person in entering into that contract; or

 

(2)       false promise to do an act, when the false promise is

(A)      material;

(B)      made with the intention of not fulfilling it;

(C)      made to a person for the purpose of inducing that person to
enter into a contract; and

(D)      relied on by that person in entering into that contract.

 








Tex. Bus. &
Com. Code Ann. '
27.01 (Vernon 2002).  Castanuela
and Marrufo contend Kelly does not have standing
under this statute, claiming (without any citation to authority) that only a
seller or purchaser of stock can enforce section 27.01.  In our reading of the statute=s plain language, we do not see that
the law is so exclusive.   See Manley
v. State, 774 S.W.2d 334, 338 (Tex. App.--Austin 1989, pet. ref=d) (citing Lewis v. Davis, 145
Tex. 468, 474, 199 S.W.2d 146, 149 (1947)); Tex.
Bus. & Com. Code Ann. ' 27.01 (Vernon 2002).  We will therefore employ the general formula
used in determining whether Kelly has standing.

In general, standing requires that
there (a) shall be a real controversy between the parties, which (b) will be
actually determined by the judicial declaration sought.  Texas Ass=n of Bus. v. Texas Air Control Bd., 852 S.W.2d 440, 446-47 (Tex.
1993) (citing Board of Water Eng=rs v. City of San Antonio, 155 Tex. 111, 114, 283 S.W.2d 722,
724 (1955)).  We conclude that under the
classic analysis, Kelly does have standing to proceed under section 27.01.  The appellees have
failed to provide authority dictating otherwise.  Thus, we sustain that portion of Kelly=s issue on appeal challenging the
trial court=s ruling of statutory fraud under
section 27.01.

iii        conclusion
with respect to claims of fraud

Summary judgment with respect to the
corporation RGCG is affirmed as to all fraud causes of action.  Summary judgment on the
causes of action for common law fraud and statutory fraud under Tex. Bus. & Com. Code Ann. ' 27.01 is reversed against Castanuela and Marrufo.

Corporate Action








Finally, Kelly claims that he is
entitled to pursue his claim for declaratory relief that he should have become
a director and president of the corporation after the sale.  In that regard, he claims that Castanuela called the February 21, 1994 meeting without
appropriate notice.  Ten years have
elapsed during which Castanuela and Marrufo have elected themselves to RGCG=s board of directors and appointed Marrufo president of RGCG. 
Any declaration of Kelly=s rightful position in the company ten years ago cannot help
resolve any active controversy now.  The
point is moot; summary judgment with respect to the request for declaratory
judgment is affirmed.

Conclusion

We affirm summary judgment for the
corporation RGCG on promissory estoppel, equitable estoppel, fraud, statutory fraud, and declaratory judgment
that Kelly is the president and director of RGCG.  We reverse summary judgment on the breach of
contract claim against RGCG.

We affirm summary judgment for the
individuals Castanuela and Marrufo
on equitable estoppel and declaratory judgment. We
reverse summary judgment for them with regard to breach of contract, promissory
estoppel, fraud, and statutory fraud. The case is
remanded for further proceedings consistent with this opinion.

 

SUSAN
LARSEN, Justice

February 19, 2004

 

Before Panel No. 1

Larsen, McClure, and Chew,
JJ.

 











[1]RGCG
was a party to the Letter of Intent through Kelly=s
agreement as president, and thus there is a fact question as to whether it
assumed obligations that were later breached.